OPINION OF THE COURT
Fuchsberg, J.
The question presented on this appeal is whether the concededly erroneous admission into evidence of a statement given in violation of his right to counsel by defendant, Charles Schaeffer, was harmless error in light of his other statements which properly were received. The Appellate Division held the tainted statement harmless and affirmed defendant’s conviction (79 AD2d 1034). Because we cannot agree with this conclusion, we reverse and order a new trial.
At a suppression hearing, it was adduced that early one morning, the body of Charlie Angelos was found dead at the bar he tended at the Steinway Terrace in Queens. He had been shot through the head. Later that day, preliminary investigation led detectives to seek out defendant at his mother’s house, from which they asked him to accompany them to the police station. These detectives testified that he did so willingly and that they therefore had no occasion to question him or to give him the warnings against self incrimination mandated by Miranda v Arizona (384 US 436). Defendant’s mother, the only witness the defendant produced at the hearing, described how, as her son left with the officers, he asked her to call an attorney named Lester. On this point the detectives’ recollection was to the contrary.
The hearing also developed that, when the defendant arrived at the station house, he was turned over to another officer, Detective McTigue, who, in his turn on the stand, narrated how “I advised the defendant of his right to *452 counsel and he indicated to me that he didn’t do anything and that he would answer questions put to him. I asked him if he owned a gun and he said that he didn’t own a gun. I asked him if he was at the Steinway Terrace Park on March 18 and 19 and he stated that he went in there in the evening, maybe around 5 P.M. or 7 P.M. He stated he had some drinks, he left and he went to P.J.’s Bar on 21st Street. Later on in the evening, he came back to the Steinway Terrace Bar. He had a drink and then he went home.” At this juncture, as McTigue went on to relate, he confronted the defendant with a man named McGuinness, upon whose appearance the defendant asked “Aren’t you the man that was in the bar when I left last night?”, to which McGuinness replied, “Wait a minute. You have it reversed. You were the man in the bar when I left, you were the only one left in the bar; that must have been 3:45 A.M.”. And, after McGuinness was excused, McTigue, accusing the defendant of lying, told him, “You said you didn’t own a gun and I have a man that said you told him that you owned a .45. You said that you were not the last one in the bar and now I have a man who said you were the last one in the bar”. After McTigue reiterated the claimed inconsistencies “several times”, defendant finally replied, “All right, I shot him. I will take you to where the gun is”. This was his first admission of the shooting.
Continuing his testimony, McTigue described how the defendant then led him: and several other detectives back to his mother’s house, where he pointed to a box which he said contained the murder weapon. When McTigue opened it and found no gun, the defendant, explained, “Well, the other gun is in the back” and indicated a second box. Opening this one, McTigue recovered a bolstered, fully loaded .38 caliber pistol, which defendant identified as one he had taken from the deceased. Right after that, according to McTigue, the defendant asked his mother to give the police the murder weapon and volunteered, “I shot the man and I want to get it over with”. Significantly, at this time, while they were all still at the mother’s house, as McTigue later acknowledged, the mother called out that there was a lawyer on the telephone and McTigue replied that he would not speak to any lawyer on the telephone and that, if *453 it was defendant’s lawyer, she should tell him to meet them at the station house.
The police then returned the defendant to the station house, where he made a third, this time more detailed, oral statement to McTigue, who related it to the hearing court as follows: “I questioned the defendant some more and he stated that he was in the bar, he had about 20 drinks, scotch and soda. There were three people at the bar, himself, the cook, Tommy [Planz], and another man with gray hair [Mr. McGuinness] * * * He stated that after a while, Tommy Planz, the cook, left and that left himself and the gray-haired man at the end of the bar. At about 3:30, twenty minutes to four, the man at the end of the bar left which left him and the bartender. Charlie, the bartender, started to count the receipts. Mr. Scha[ef]fer took a $5 bill out and put it on the counter as a tip for the bartender. He took out the .45 and pointed it at Charlie and Charlie said, ‘Look, don’t get excited, I will take my gun out and I will put it on the bar so you can see that everything is all right.’ He said with that the gun went off and it kept on going off and Charlie fell down * * * He then said, T went behind the bar and took the gun. I went home. I put the gun in the basement and I went to bed.’ ”
It was on this record and no more that the hearing court found that defendant’s statements were made “[after] he was told of his rights [and] waived his right to remain silent and he waived his right to counsel when he made the statements”. No specific finding was made concerning the point at which defendant invoked his right to counsel. All the statements were ruled admissible.
Testimony that these three statements and two later ones were made was introduced at the trial. Of the additional two, the initial one was made in a police car on the way back from the mother’s house after the defendant had given McTigue the gun he admitted taking from Angelos. It is undisputed that it started with a self-generated remark by the defendant that “You guys must hate me for what I did” and, after the two detectives who heard it reassured the defendant on this point, he continued, “Charlie was a good friend of mine. Charlie was the only guy that ever did anything for me, and look what I did to *454 him”. The last of the two additional statements were part of a telephone conversation between the defendant and his mother and brother while he was waiting to be booked. McTigue, who overheard the conversation, quoted the defendant as having said, “Mom, you do not understand me. You know I had problems”, and, to the brother, “Do not wind up like me. You know what I am doing, do not be like me”. At trial, defense counsel did not object to the introduction of any of this matter.
Assuming, without deciding, that defendant’s first two statements were properly admitted at the trial,* it is clear that admission of defendant’s detailed station house statement, taken by McTigue immediately after the detective had refused to speak to counsel on the telephone, was reversible error. Indeed, the People candidly concede that, from that moment, further questioning should have ceased. Surely, at this stage in the development of our law on this subject, it hardly needs repetition that, under these circumstances, defendant’s right to counsel had attached, that it could not be waived in counsel’s absence and that any statements taken in violation of that right would be subject to suppression (People v Garofolo, 46 NY2d 592; People v Hobson, 39 NY2d 479).
The harmless error rule, as it relates to error of constitutional dimension, is, simply stated, “that there is no reasonable possibility that the error might have contributed to defendant’s conviction and that it was thus harmless beyond a reasonable doubt (Chapman v. California, 386 U. S. 18; Fahy v. Connecticut, 375 U. S. 85).” (People v Crimmins, 36 NY2d 230, 237.) While easily articulated, however, its application at times presents a considerable challenge (see, generally, McCormick, Evidence, § 183, p 431; Kamisar, La Fave and Israel, Modern Criminal Procedure [5th ed], pp 809-818; Mause, Harmless Constitutional Error: The Implications of Chapman v. California, 53 Minn L Rev 519; Notes, 83 Harv L Rev 814, 20 Stanford L Rev *455 83; see, generally, Traynor, The Riddle of Harmless Error, pp 1-26).
Especially is this true when the flawed evidence, as here, is in the nature of a confession, since, as pragmatic practitioners long ago learned, confessions of crime, supremely self-condemnatory acts, are almost sure to weigh most heavily with fact finders (see People v Ramos, 40 NY2d 610, 618-619; McCormick, Evidence [2d ed], § 148, p 316; Richardson, Evidence [10th ed — Prince], § 556). Nevertheless, before constitutional error, even when it deals with confessions, may be found to be harmless, it is not necessary that the untainted evidence on which the verdict in the case must be supported demonstrate undisputable guilt. Rather, the reasonable doubt standard, extremely high though it is, still leaves room for judgmental determination of harmlessness (e.g., People v Sanders, 56 NY2d 51, 66-67). In cumulative statement cases this invites caution.
Thus, reviewing courts should take into account the degree to which tainted statements are duplicative of untainted ones and, to the extent that they are not, the nature and extent of the differences. For, though the corroborative nature of an overlap between a statement whose admission is infected with error and one which is not may contribute to the weight a fact finder gives to one which was properly received, still the more they differ the greater the possibility that the additional matter supplied by the tainted one was a sine qua non of the production of the verdict.
And, because consideration of whether an error is harmless requires an evaluation not only of the tainted matter, but of the strength of the case absent the taint, the court must focus on the reliability and persuasiveness of the untainted matter and its source. So, for instance, written statements may be “looked at as more reliable than their more evanescent oral counterparts” (People v Garofolo, 46 NY2d 592, 602, supra; see People v Prince, 50 NY2d 883 [tainted statement taken by an Assistant District Attorney in his official capacity held not harmless though untainted one was of similar content]).
In short, neither side of the evidentiary equation may be ignored; in the end, the picture must be seen as a whole. *456 The ultimate question, of course, must be whether the People, as the beneficiary of the error, have fully borne the burden of establishing harmlessness by the strict, though not unrealistic Chapman-Crimmins standard; fair trial requires no less (Chapman v California, 386 US 18, 24, supra).
Turning then to the statements in the case before us now, we note at once that the one statement taken in defiance of the fact that the right to counsel had attached not only was by far the longest, but also the most detailed. From this the jury could very well have inferred that, in contrast with what could be claimed to be the earlier utterances of a pressured suspect, its narrative carried the authoritative ring of more precise and unharried deliberation. More important, the defendant’s two preceding colloquies with the police — in one of which he said little more than “I shot him” and in the second of which the heart of his confession again was “I shot the man and I want to get it over with” — were bare of any indication of intent or motive. Indeed, standing alone, their tone of contrition was as consistent with remorse over an accidental shooting as over murder. Nor were the two brief statements made subsequent to the erroneously admitted one — the one in the car with the police and the other on the telephone with his family — in any different vein.
On the other hand, the tainted statement, independently and noncumulatively, told a tale by which, although the defendant attempted to portray the events of the fatal night as ones culminating in an accident, it readily could have led the jury to believe his motive was robbery, since it included, for the first time, a recounting of how Angelos had started to count his day’s receipts immediately before he was killed. Moreover, this dovetailed particularly in its timing, with what might otherwise have been the less significant fact that, when Angelos’ body was found, he was clutching money in his hand.
Furthermore, other condemnatory evidentiary interaction between the tainted statement’s factual recital and the People’s properly admitted proof at trial came to depend on the defendant’s assertion therein that the gun went off, presumably by accident, after defendant had *457 placed it on the bar behind which Angelos was standing. This became the very vulnerable target of the People’s forensic evidence, which was offered to establish not only that Angelos had been shot after he had already fallen, or been pushed, to the floor, but, as a not inconsequential byproduct, to undermine the credibility of defendant’s story as a whole.
In all, on the record here, we conclude as a matter of law that it cannot be said beyond a reasonable doubt that the erroneously admitted statement did not contribute to the defendant’s conviction.
Accordingly, the order of the Appellate Division should be reversed, the tainted statement suppressed, and the case remitted to Supreme Court, Queens County, for a hearing on the admissibility of the first two statements and for a new trial in accordance with this opinion.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Meyer concur; Judge Gabrielli taking no part.
Order reversed, tainted statement suppressed, and case remitted to Supreme Court, Queens County, for further proceedings in accordance with the opinion herein.

 Defense counsel also sought to have these confessions suppressed on the ground that the right to counsel had attached when the defendant allegedly asked his mother to call attorney Lester. Though the hearing court never resolved the issue of credibility that arose over whether he had made such a request in the presence of the police, our disposition of this appeal makes resolution of that issue unnecessary at this time.