Fuchsberg, J.
(concurring). I am not prepared to agree that the trial of Jean Harris was error-free. But, as we and other courts have had occasion to realistically remark in the past, “in this imperfect world, the right of a defendant to a fair appeal, or for that matter a fair trial, does not necessarily guarantee him a perfect trial or a perfect appeal” (People v Rivera, 39 NY2d 519, 523). In deciding whether the trial in the present case was fair, one of the rulings the majority finds acceptable gives me more than pause.
The troublesome point is the admission into evidence of the statement overheard by the police officer, even if inadvertently,[1] during the defendant’s telephone consultation with the lawyer with whom she originally spoke while she was in custody on the night of the shooting. The crucial words at issue, “Oh, my God, I think I’ve killed Hy”, were uttered after the opportunity for such communication had been arranged by the police when Mrs. Harris, in response to their query, indicated that she wished to speak to her *352 attorney.[2] Since, in making the arrangements, the police were charged with the obligation to take reasonable precautions to ensure privacy, I cannot agree with the majority that the attorney-client privilege had not attached or that the statement the police overheard was one properly characterized as spontaneous.
Consider the charged atmosphere which prevailed at the time. It takes no imagination to sense Mrs. Harris’s emotionally distraught state. After giving the police her version of how she had come to shoot Dr. Tarnower, she had fainted upon the sight of his body being removed to the hospital. The effort to reach the lawyer sequentially followed immediately upon this episode. One officer used the telephone in the housekeeper’s bedroom to do so, whereupon a second officer, having been instructed to assist Mrs. Harris into the room, noticed that she walked so unsteadily that, as he later was to testify, she “looked * * * like she couldn’t make it under her own power”. At the conclusion of the conversation, he found it necessary to lift her out of her chair and help her out of the room. At the suppression hearing, he candidly advised the court that, though aware that she was talking to a lawyer, he remained so closely within earshot of the conversation during its entire 3 to 5 minute duration that, at its termination, he was able to get to her side quickly enough to take the receiver from her.
It is our well-settled law that, for a statement to be dubbed “spontaneous” within the meaning of that narrow exception to the rules protective of the right to counsel, it must be one “ ‘made without apparent external cause, i.e., self-generating’” (People v Lanahan, 55 NY2d 711, 713; People v Stoesser, 53 NY2d 648, 650). Spelled out more sensitively, it may not have been “the result of inducement, provocation, encouragement or acquiescence” by the police (People v Rivers, 56 NY2d 476, 479; People v Lana *353 han, supra; People v Stoesser, supra; People v Maerling, 46 NY2d 289, 302-303).
Applied aptly in a privilege case at nisi prius, the court there put it as follows: “When [a] defendant seeks to communicate with a person and that communication would ordinarily be deemed privileged, those who hold him in custody should either (1) afford him the right to make the communication in conditions of privacy or (2) warn him that if his utterances are overheard, they may be testified to by the person overhearing them, or (3) bar all hearers from testifying to confidential communications overheard by them when conditions of privacy are not accorded and appropriate additional warnings are not given” (People v Brown, 82 Misc 2d 115, 120-121 [Greenfield, J.]).
Measured either way, it seems impossible to escape the conclusion that Mrs. Harris’s admission was, at least in part, the product of “acquiescence” in, if not exploitation of, her obvious vulnerability. A lay person, presumably without sophistication in the subtleties surrounding constitutional safeguards of the right to counsel, she already had unburdened herself to the police, and hence was unlikely to be chary of doing so again (see People v Tanner, 30 NY2d 102, 106). On the other hand, the police, trained in such matters and cognizant of Mrs. Harris’s state of mind as well as her previous willingness to talk with them, should have been well aware of the likelihood that she would make further admissions to her lawyer. In any event, they were obliged to “scrupulously honor” her right to counsel by ensuring that she could talk to her lawyer in confidence (see People v Grant, 45 NY2d 366, 375-376). Yet, not even the simple expedient of telling Mrs. Harris not to begin her conversation until he and the house manager’s husband had left the room was essayed. I therefore cannot see how we can fail to agree with the Appellate Division that the admission of the “Oh, my God” statement violated the defendant’s right to counsel (see People v Grimaldi, 52 NY2d 611, 617).
This said, it also cannot be gainsaid that the admissibility of Mrs. Harris’s earlier statements to the police that she had “shot” Dr. Tarnower was not disputed. Nor can it be blinked that, on whatever weight they carried on the issue *354 of intent, there was no meaningful difference between the earlier ones and the one now challenged. In the first statements, she acknowledged her act; in her last admission, she simply added her awareness of the victim’s condition at that time. The difference, substitution of the word “killed” for “shot”, viewed objectively, essentially reflected little more than the undisputed deterioration in Dr. Tarnower’s condition between the time when she believed he had only been wounded and the time when it appeared that the wounds might be fatal.
Furthermore, the flawed statement did not bear on the vital inculpatory or exculpatory nature of the circumstances in which the shooting took place, the matter on which the outcome of this long trial, which heard 92 witnesses over a 14-week period, finally would have to turn. Indeed, neither “shot” nor “killed”, in and by itself, describes a criminal act per se.
Nevertheless, defendant argues that the last statement, since it alone included the word “killed”, should be considered more prejudicial than the others. This, however, is far from persuasive. For defendant’s use of term “killed” was neutralized by her prefatory language, “Oh, my God, I think”, which surely could be seen as evoking connotations of dismay and surprise rather than criminal intent.
But, counters’the defense, the prosecutor’s stress on the word “killed” rather than “shot” added to the alleged prejudice when, in the course of his summation, he discussed the statements. To this the answer is simple. That the prosecutor chose to focus his perfectly proper adversarial rhetoric on the statement overheard by the police officer rather than on the ones Mrs. Harris had volunteered previously, was, in context, of limited moment. As any good trial lawyer, or any good public speaker, will understand, had the flawed statement featuring the word “killed” not been available, he could have resorted to the earlier ones which had employed the word “shot” to make the same arguments, with the same fervor and, no doubt, to like effect.
Regretfully, therefore — because the vitality of the Bill of Rights depends, above all, on the right to counsel — I am compelled, on the record of this case taken as a whole, to *355 conclude that the error does not justify reversal. For, against the background of the prior untainted statements Mrs. Harris-already had made on her own, the erroneous admission of the one she made to the lawyer was harmless beyond a reasonable doubt (People v Schaeffer, 56 NY2d 448, 454). Moreover, to the extent that the violation of defendant’s right to counsel also trespassed upon her attorney-client privilege, the same conclusion is warranted (see People v Thomas, 50 NY2d 467, 475-477 [my concurrence]; cf. People v Glenn, 52 NY2d 880).
In Schaeffer, addressing the standard for harmlessness in cases where the defendant, as did Mrs. Harris, had made admissible as well as inadmissible statements, we held that, in accordance with elementary logic, “reviewing courts should take into account the degree to which tainted statements are duplicative of untainted ones and, to the extent they are not, the nature and the extent of the differences * * * [T]he more they differ the greater the possibility that the additional matter supplied by the tainted one was a sine qua non of the production of the verdict” (56 NY2d, at p 455; see, also, People v Sanders, 56 NY2d 51, 66-67). Here, on analysis, as I have indicated, the difference was one in form, not in fact.
I, too, therefore, must cast my vote to affirm.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Meyer concur with Judge Gabrielli; Judge Fuchs-berg concurs in a separate opinion.
Order affirmed.

. For the reasons I discuss later, on the relevant facts, whether the overhearing was inadvertent is besides the point. In any event, close inspection of the record indicates that, though the officer, on direct, at first did testify, as the majority states, that he was backing out of the room at the time, he did not go so far as to say that he ever left the room during the conversation. Rather, on cross-examination, he admitted that he never made “any attempt of any kind to get out of earshot and give her privacy to speak with her attorney”.

. The officer who sent the overhearing officer into the room unquestionably had direct knowledge of the fact that an attorney-client consultation was about to take place, since he had actually put through the telephone call. In any event, a defendant is not to be “penalized because of any inadequacy of internal communication within the law enforcement establishment” (People v McLaurin, 38 NY2d 123, 126 [Gabrielli, J.]; cf. Santobello v New York, 404 US 257, 259-260).