THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
NEFTALI AYALA, Appellant.

Second Department, November 21, 1988

APPEARANCES OF COUNSEL

*Stephen J. Pittari (Raymond C. Volper* of counsel), for appellant.

*Carl A. Vergari, District Attorney (Richard L. Hecht* and *Maryanne Luciano* of counsel), for respondent.

## OPINION OF THE COURT

SPATT, J.

In this case, we are called upon to determine whether testimony given at a suppression hearing may, pursuant to CPL 670.10, be received into evidence at a subsequent proceeding when the witness has become unavailable. We hold that suppression hearing testimony is not "testimony given by a witness at * * * a trial of an accusatory instrument" within the meaning of CPL 670.10 and, therefore, that it was error for the trial court to admit such testimony in this case. This case also presents the issue of the admissibility of the postarrest statements of two separately tried codefendants. We find that the statements do not satisfy any recognized exception to the hearsay rule and, accordingly, hold that the admission into evidence of the statements at the defendant's trial was error. However, in view of the overwhelming evidence of the defendant's guilt and the trial court's redaction of both the hearing testimony and the codefendants' statements, we further find that the errors were harmless.

I

The defendant, Neftali Ayala, also known as "Shock", was convicted of murder in the second degree and attempted assault in the first degree as a result of his participation in an armed attack upon James McKinley and Thomas Barrett on March 21, 1982, in Yonkers, New York, which resulted in McKinley's death and injuries to Barrett. Although other participants were also indicted for crimes arising from this incident, this defendant was tried alone.

The evidence presented at trial by the prosecution established that the events underlying the defendant's conviction were precipitated by a confrontation between the defendant and the victims earlier that same day. Eileen Morgan, the girlfriend of the injured complainant Thomas Barrett, testified that on the evening of March 21, 1982, she was with Barrett and James McKinley near a gas station on Palisade Avenue in

Yonkers when she saw some Hispanic men on the same street some distance away. She recognized one of the Hispanic men from the school they had both attended. She knew him by the nickname "Shock". She identified the defendant as "Shock". Morgan witnessed the defendant and Barrett and McKinley fighting and walked away to Barrett's house.

James Santiago and Franklin Villar testified that they were walking on Palisade Avenue with the defendant on the evening of March 21, 1982, when two men, who they later learned were Thomas Barrett and James McKinley, approached the defendant. Barrett, who was the larger of the two men, asked the defendant whether he had had "trouble with" McKinley. The defendant responded by hitting Barrett. The two men then engaged in a fistfight. In the course of the fight, the defendant fell and McKinley kicked him in the face. The defendant got up, took off his belt and struck Barrett in the face with it.

McKinley and Barrett then ran a short distance and taunted the defendant to come after them. Barrett offered to fight the defendant "one-on-one", and the two men began fighting again. After the defendant struck Barrett twice in the face, Barrett pulled out a long metallic instrument which appeared to be either a knife or an ice pick, and the defendant ran away.

At the defendant's suggestion, he, Santiago and Villar went to the home of their friend James Ortiz, also known as "Cuch". The defendant told Ortiz about the fight and stated that he wanted Ortiz to prevent McKinley from jumping in while he (the defendant) fought Barrett. Ortiz replied that he did not want to get involved unless his friend Danny Mercado, also known as "Lucan", was present. So the defendant, Santiago and Villar got into Ortiz's green Plymouth and Ortiz drove to Mercado's house. Upon discovering that Mercado was not home, Ortiz drove to another location where he found Mercado and Robert Ramos. Ortiz informed Mercado of the defendant's situation and asked if Mercado would help. Mercado and Ramos got into Ortiz's car. At Mercado's request, Ortiz stopped at Mercado's house and Mercado went in to get "something".

Meanwhile, Barrett and McKinley met Morgan at Barrett's house. At approximately 10:00 P.M., the two men accompanied Morgan to her home in an apartment building at 55 School Street in Yonkers. They walked with her to her apartment on

the sixth floor. Morgan testified that she went to a front window of her apartment to watch Barrett and McKinley and instead saw a green car with a white sign on the passenger's side drive past the front of the building.

Donnita Bunch testified that on March 21, 1982, at approximately 10:30 P.M., she was in the lobby of 55 School Street with her friend Zina Everett. She saw Thomas Barrett and James McKinley, both of whom she had known for a few years, walk into the lobby through the front entrance and enter an elevator. A short while later, Barrett and McKinley returned to the lobby where they stopped to converse with Bunch and Everett.

Meanwhile, according to the testimony of Villar and Santiago, Ortiz drove these witnesses, as well as the defendant, Mercado and Ramos to a housing project looking for Barrett and McKinley. Finding no one at this location, Ortiz, having declined the requests of Villar and Santiago to be driven home, proceeded to 55 School Street. Ortiz stopped in front of this address, and the defendant said, "I think those are them". Ortiz then drove around the corner and parked his car on Brook Street. Villar and Santiago remained in the car while Ortiz and the defendant entered the building through the back and Mercado and Ramos went through the front door.

Donnita Bunch testified, in partial contradiction to the testimony of Villar and Santiago, that after she had been talking with Barrett and McKinley for approximately 15 minutes, 3 or 4 people entered the lobby through the rear staircase door. She recognized one of these people as the defendant, who she knew from school by the nickname "Shock". She noticed that the defendant had a fresh scar on the right side of his face. According to Bunch, upon entering the lobby the defendant looked around, "jumped" and started punching James McKinley in the chest. Bunch demonstrated the punching motion for the jury. Without objection, the prosecutor described the demonstrated motion as "fist raised with the bottom portion of the hand facing forward and using the elbow as a fulcrum she is moving it back and forth." In this manner, the defendant struck McKinley three times in the left side of his chest. Bunch testified that she witnessed this attack from a distance of approximately five feet but did not see a weapon.

At this point, Bunch heard gunshots and she and Everett ran into a nearby hallway. Morgan, in her sixth-floor apart-

ment, also heard gunshots. She looked out the front window and saw Barrett and McKinley being chased by the defendant and three other people. She observed one of the other people stop twice and shoot at the fleeing men. She watched as McKinley fell, got back up and then both men got into a car on the corner.

Eleanor Brown, a tenant on the fourth floor of 55 School Street, also heard gunshots at approximately 11:00 P.M. on March 21, 1982. She went to a front window of her apartment and saw two men. One of the men was holding a gun with both hands, arms extended. He fired the gun twice. She then watched the men run around the corner to Brook Street and get into a green car. Morgan, by moving to a different window, observed four people get into a green car with a white sign on it parked on Brook Street. She also testified that she observed a "scrape or scratch" on the defendant's face. After the shooting stopped, Bunch returned to the lobby but found no one there.

Villar and Santiago also testified to hearing shots a few minutes after their companions had left the car. Villar stated that he saw his companions chasing two black men in front of the building. As he watched, Ortiz held the gun with both hands in front of him and fired. McKinley fell, then picked himself up and kept running. All four assailants then ran to Ortiz's car, and all six men went to the defendant's house.

When he got back into the car, Mercado was bleeding from the top of the head. He commented that "the guy" hit him with a bottle, so he shot him. Ortiz stated that as soon as he saw Mercado shooting, he (Ortiz) began shooting.

Dr. Vifoot Chowzhuvech testified that James McKinley arrived at the emergency room of Yonkers General Hospital at approximately 11:00 P.M. on March 21, 1982. He was unconscious, thrashing around and had no pulse or blood pressure. The doctor observed a stab wound in the area of the nipple on the left side of the chest. Approximately five minutes later, McKinley went into cardiac pulmonary arrest. All efforts at resuscitation proved unsuccessful and, at 11:45 P.M., McKinley was pronounced dead.

Dr. Chowzhuvech also examined Thomas Barrett. He observed a gunshot wound entering the right side of Barrett's back and exiting through the front. Dr. Fansern Hastanan, a surgeon at Yonkers General Hospital, testified that he per-

formed exploratory surgery of Barrett's abdomen and discovered that the injury was limited to the wall of the abdomen with no damage to the internal organs. The parties stipulated that the Thomas Barrett treated at Yonkers General Hospital was the same Thomas Barrett who had been in the lobby and who died in May 1983 from causes unrelated to this incident.

Dr. Louis Roh testified that he observed four wounds on the body of James McKinley: (1) a superficial bullet wound on the back of the left shoulder, (2) a superficial abrasion on the back of the right chest, (3) a three-and-one-half-inch deep stab wound on the left anterior chest slightly below the left nipple which penetrated the pericardial sac and the left ventricle of the heart, and (4) a stab wound in the left side of the back of the chest which penetrated the upper lobe of the left lung. Dr. Roh explained that the injury to the left ventricle of the heart caused a rapid loss of blood. He concluded that the cause of death was "stab wounds of chest, heart, lungs, bullet wounds of shoulder, internal hemorrhage".

Dr. Roh also testified as to his examination of the deceased's clothing. This testimony indicated that there was at least one perforation in the left upper portion of the deceased's leather jacket which did not correspond to a penetration of the deceased's body.

In addition to this testimony, the People adduced testimony from the superintendent of 55 School Street, Theodore Mancini, concerning the design, dimensions and lighting conditions of the lobby. There was also testimony from six police officers concerning the recovery of spent bullets and shell casings at the scene of the crime and from the clothing and body of the deceased. A ballistics expert testified that the recovered items consisted of three .22 caliber bullets which had been fired from the same .22 caliber revolver and two casings which had been fired from the same .25 caliber semi-automatic pistol. Finally, a photograph of the defendant taken on March 22, 1982, was admitted into evidence.

The defendant did not testify or call any witnesses on his behalf. The theory of the defense, articulated in defense counsel's opening statement and summation, was that the defendant went to 55 School Street intending only to participate in a "fair fight". The defense argued that since no one testified to seeing a weapon in the defendant's hand, it was possible that someone else inflicted the fatal injury after the confrontation in the lobby.

## II

Purposely omitted from the above synopsis of the evidence is any consideration of the improperly admitted evidence. Such evidence plays no role in this court's evaluation of the strength of the People's case against the defendant *(see, People v Schaeffer,* 56 NY2d 448, 455).

One item of inadmissible evidence was the redacted *Wade* hearing testimony of Zina Everett, which was read to the jury on the ostensible authority of CPL 670.10. Everett's hearing testimony was, in substance, identical to the trial testimony of Bunch. There were only two significant differences. First, Everett testified that the defendant struck McKinley approximately 8, rather than 3, times. Second, Everett testified that the defendant had an unidentified object in his hand. However, she later stated that the only weapons she observed were guns in the hands of the other perpetrators. When the hearing testimony was read to the jury, all hearsay as well as any mention of photographic identifications of the defendant were omitted.

■ The District Attorney's argument that the defendant's statutory claim is unpreserved for appellate review is without merit. CPL 470.05 (2) provides that a party's protest to a court's ruling in a criminal trial is sufficient to present a question of law for appeal "if in response to a protest by a party, the court expressly decided the question raised on appeal." Although the statutory amendment adding the above-quoted language did not take effect until August 2, 1986, 2½ years after the rendition of the judgment in this case, the Legislature specifically provided that the amendment "shall apply to all matters, actions or proceedings pending as of [its effective] date" *(see,* L 1986, ch 798, § 2). The appeal in this case was pending as of the effective date of the amendment and, therefore, the defendant is entitled to the statutory benefit. In this case, the issue of the admissibility of the *Wade* hearing testimony under CPL 670.10 was specifically addressed by the Trial Court in a postverdict, published opinion *(see, People v Ayala,* 121 Misc 2d 1073). In its opinion, the court stated: "The defendants have opposed the People's application on the grounds that the prior testimony was not given during one of the enumerated proceedings under CPL 670.10 (subd 1), i.e., the testimony was not given at a trial, or a felony hearing, or a conditional examination pursuant to CPL article 660" *(People v Ayala, supra,* at 1073).

Although this issue was not raised in the defendant's trial counsel's oral opposition to the People's application for permission to use the *Wade* hearing testimony, "[u]nder the amendment a question of law is preserved if the point was expressly decided by the trial court in response to a protest, even though the protesting party overlooked that argument when making the protest" (Preiser, Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 470.05, 1988 Pocket Part, at 5). Thus, we conclude that the issue of whether suppression hearing testimony is admissible pursuant to CPL 670.10 (1) (a) was preserved for appellate review as a matter of law (*cf., People v Claudio*, 130 AD2d 759, *lv denied* 70 NY2d 873).

■ We also reject the defendant's contentions that the People failed to exercise due diligence to secure the witness's presence at trial and that the use of the hearing testimony violated his constitutional right to confront and cross-examine witnesses against him. First, with respect to the prosecutor's efforts to locate the witness, the trial court directed a hearing which was held on November 17, 1983. The People called six witnesses—Zina Everett's mother, Betty Smith; Everett's friend, Donnita Bunch; and four law enforcement officials who had searched for Everett. Cumulatively, the testimony established that Ms. Everett had last been seen by her family and friends on October 26 or 27, 1983, 1 or 2 days after she testified at the *Wade* hearing. Everett had telephoned and given her mother an address in Manhattan. However, repeated police checks of that location, including surveillance, were fruitless. Smith testified that her daughter had never before remained away from home for such an extended period of time. Telephone calls to the Department of Social Services, local hospitals, the Westchester County Jail, and the mother of Everett's boyfriend were similarly unavailing. Bunch testified that a day or two before the hearing, Everett had told her that the defendant's sister had come to her (Everett's) house and asked her "not to put their brother in jail".

The trial court held, and we agree, that the People proved the statutory prerequisite to use of prior testimony in a criminal proceeding that the witness could not "with due diligence be found" (CPL 670.10 [1]). The efforts to find Everett were exhaustive. The prosecution, which had no warning that she intended to make herself unavailable for trial, obtained the cooperation of persons likely to have information as to her whereabouts and pursued every lead, to no avail. There was

no indication that the witness's absence was "due to indifference or a strategic preference for presenting her testimony in the more sheltered form of hearing minutes rather than in the confrontational setting of a personal appearance on the stand" *(People v Arroyo,* 54 NY2d 567, 571, *cert denied* 456 US 979). Accordingly, the unavailability of the witness was established *(see, People v Arroyo, supra; People v Nettles,* 118 AD2d 875, 876, *lv denied* 68 NY2d 671).

■ Furthermore, the use of the witness's suppression hearing testimony did not violate the defendant's State or Federal constitutional right to confront and cross-examine an adverse witness (US Const 6th Amend; NY Const, art I, § 6). While we recognize and reemphasize the importance of this right in a criminal case, we find that the opportunity for cross-examination afforded defense counsel at the suppression hearing was sufficient to test the reliability of the witness and to insure the fairness of the proceeding *(see, People v Arroyo, supra,* at 574).

The cross-examination of Everett at the suppression hearing was lengthy and far-reaching. The cross-examination explored the facts and circumstances of the incident and the relationships of the various persons involved as well as the identification procedures. In determining the prosecution's application to use the suppression hearing testimony, the trial court invited defense counsel to identify any potential areas of cross-examination which had not been adequately explored at the suppression hearing. Counsel was unable to formulate even one additional question he would have asked if the witness had appeared for trial. Similarly, on appeal, the defendant has failed to advance a specific claim of prejudice from an adverse ruling or perfunctory cross-examination at the hearing. Under the circumstances, we agree with the trial court that "had Ms. Everett been available to testify at the trial, she could have added no more to her testimony than that which was given at the *Wade* hearing, nor could defendants' counsel have cross-examined her to any greater length regarding that testimony" *(People v Ayala,* 121 Misc 2d 1073, 1075, *supra).*

Although the purpose of a *Wade* hearing, i.e., to determine the fairness of identification procedures and concomitantly the admissibility of identification testimony, differs from the issue of guilt or innocence determined by a trial, the record discloses that the right to cross-examine at the suppression hearing was not frustrated in any meaningful way. Furthermore, when the factors relevant to a determination of an

independent source for the identification (e.g., lighting conditions, descriptions of the perpetrators, distances), which were adduced from the witness in this case, are added to this calculation, it is clear that the subject and scope of the two proceedings were sufficiently similar to satisfy constitutional concerns. "For, in the end, the 'constitutional provision was not intended to secure to the accused person the right to be confronted with the witnesses against him upon his final trial; but to protect him against *ex parte* affidavits and depositions taken in his absence, as was frequently the practice in England at an early day' " *(People v Arroyo,* 54 NY2d 567, 574, *supra,* quoting *People v Fish,* 125 NY 136, 152).

## III

■ Notwithstanding our rejection of the due diligence and confrontation claims, we find merit to the defendant's argument that *Wade* hearing testimony, indeed, all suppression hearing testimony, is not included among the types of prior testimony listed in the statute which may be used at a subsequent proceeding if a witness becomes unavailable. CPL 670.10 (1) provides, in pertinent part, as follows: "Under circumstances prescribed in this article, *testimony given by a witness at (a) a trial of an accusatory instrument,* or (b) a hearing upon a felony complaint conducted pursuant to section 180.60, or (c) an examination of such witness conditionally, conducted pursuant to article six hundred sixty, may, where otherwise admissible, be received into evidence at a subsequent proceeding in or relating to the action involved when at the time of such subsequent proceeding the witness is unable to attend the same by reason of death, illness or incapacity, or cannot with due diligence be found" (emphasis supplied).

This statute, which is largely a codification of the common law *(see, People v Arroyo,* 54 NY2d 567, 569, *supra),* does not expressly include suppression hearing testimony among the types of testimony which may be used at a later proceeding. The only possible theory supporting inclusion of such testimony is the argument advanced by the prosecution that "a trial of an accusatory instrument" includes suppression hearings. In support of this theory, the People advance three arguments: (1) that generally suppression hearings and trials are conducted in such close temporal proximity, in this case 15 days, that in effect they constitute a single proceeding, (2)

that a somewhat anomalous situation is created by excluding suppression hearing testimony while admitting the generally more limited testimony given at a hearing upon a felony complaint conducted pursuant to CPL 180.60, and (3) that for purposes of determining a defendant's statutory right to be present at "a trial", courts have interpreted the term to include suppression hearings (see, People v Anderson, 16 NY2d 282, 286; People v Hubener, 133 AD2d 233, 234), and that interpretation should also apply to CPL 670.10.

These arguments are unpersuasive. First, adoption of a rule based upon temporal proximity would result in the untenable situation that testimony adduced at the same type of hearing held at a time more distant from the trial would be inadmissible. The number of days between the hearing and a trial is irrelevant to the important concern of whether the testimony is reliable. Furthermore, no sound basis for determining an appropriate cutoff point has been suggested or is discernable. The rule suggested by the People provides no guidance for implementation and would potentially result in substantial confusion and conflicting rulings in the trial courts. We decline to indulge in a determination which is best entrusted to the Legislature.

Second, the apparent intent of the Legislature in enacting CPL 670.10 was to prevent the discontinuance of a criminal prosecution due to the unavailability of a witness if other reliable admissible testimony is readily available. Excluding suppression hearing testimony while permitting testimony given at a trial, a felony hearing pursuant to CPL 180.60 or a conditional examination pursuant to CPL article 660 is not contrary to that purpose. Unlike any of the proceedings expressly included in the statute, hearsay is admissible at suppression hearings (compare, CPL 710.60 [4] with CPL 180.60 [8], and CPL 660.60 [1]). Suppression hearings, unlike the other proceedings, are likely to contain testimony inadmissible at trial for reasons other than hearsay (e.g., testimony concerning photographic identifications). Moreover, because the hearing is held without a jury, defense counsel might choose to pursue a legitimate strategy involving evidence prejudicial to his client (e.g., adducing his client's criminal history), which counsel would not have pursued in the presence of a jury. Although these problems can be overcome by careful redaction of the suppression hearing testimony, they demonstrate a rational basis for exclusion from the statute of suppression hearing testimony by the Legislature.

Third, although judicial interpretation of the same term contained within a different provision of the same statute is instructive, it is not controlling. Thus, the holding of *People v Anderson* (16 NY2d 282, *supra*), that a trial encompasses suppression hearings for the purpose of determining the defendant's right, under former Code of Criminal Procedure § 356 (CPL 260.20) to be present, does not compel a similar interpretation in this case. The court in *Anderson* was faced with compelling constitutional considerations. As a rule, a statute should be construed to uphold its constitutionality *(see,* McKinney's Cons Laws of NY, Book 1, Statutes § 150). Such considerations do not impact upon the statute at issue in the instant case.

Having disposed of the prosecution's arguments, we now proceed to determine whether in enacting CPL 670.10, the Legislature intended to include suppression hearings in the language "a trial of an accusatory instrument". Construction or interpretation of a statute presupposes ambiguity or doubt. Where the language of a statute is plain and unambiguous, explanation is superfluous *(see, e.g.,* McKinney's Cons Laws of NY, Book 1, Statutes §§ 71, 76, 92 [b]; § 94; *Oneida Sav. Bank v Tese,* 108 AD2d 1042, 1043; *Matter of Best Way Beer & Soda Distribs. v New York State Liq. Auth.,* 99 AD2d 727).

In the instant case, the language at issue is clear and unambiguous. The plain meaning of the word "trial" does not include a suppression hearing. Indeed, the court in *People v Anderson* (16 NY2d 282, 288, *supra)* recognized that "[t]he suppression hearing is, of course, not within the specific meaning of 'trial' as heretofore defined". Furthermore, in the context of a conflict between the defendant's right to a fair trial and the public's right to access to criminal trials, the Court of Appeals has stated: "In the case now before us, the Trial Judge was not presiding over a trial on the merits. His concern was with a suppression hearing which, of course, is 'not within the specific meaning of "trial" ' " *(Matter of Gannett Co. v De Pasquale,* 43 NY2d 370, 378, *affd* 443 US 368, quoting *People v Anderson, supra).*

Review of the relevant legislative history and commentary supports the conclusion that the word "trial" was intended to mean just that and not other proceedings. The staff comments in the 1968 Report of the Temporary Commission on Revision of the Penal Law and Criminal Code, referred to in the Governor's memorandum in support of the enactment of CPL

670.10, state that CPL 670.10 "embraces *all the circumstances under which testimony given on some previous occasion may be introduced at a subsequent proceeding*" (1968 Report of Temporary Commn on Rev of Penal Law and Criminal Code, at 385 [emphasis supplied]). The Practice Commentary to CPL 670.10 by now Judge Bellacosa states: "The kinds of usable previous testimony are also listed exclusively as at trial or at CPL 180.60 felony complaint hearing or at CPL 660 conditional examination. *Note especially that no other type of prior hearing, suppression for example, is included and therefore would not qualify for subsequent use*" (Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 670.10, at 333 [emphasis supplied]).

Finally, the 1988 Report of the Advisory Committee on Criminal Law and Procedure to the Chief Administrator of the Courts, dated December 1987, recommends at page 78 that CPL 670.10 be amended "to permit the use of prior testimony given at any pretrial hearing when all statutory conditions are met". The authors explain their recommendation as follows: "Authority to use transcripts of prior testimony given at pretrial hearings likewise is reasonable and desirable, since the statute already permits the use of previous testimony given at preliminary hearings upon felony complaints. Other previous testimony is no less reliable and, therefore, also should be admissible when all other statutory requirements are met. The United States Supreme Court has determined that the use of previous testimony of an unavailable witness does not violate the confrontation clause of the United States Constitution, when adequate safeguards similar to those applicable in New York exist to ensure the reliability of the testimony. *Ohio v Roberts,* 448 US 56 (1980)" (1988 Report of Advisory Comm on Criminal Law and Procedure to Chief Admin Judge of Cts, at 78).

The proposed amendment would change CPL 670.10 to read as follows: "1. Under circumstances prescribed in this article, testimony given by a witness at (a) a hearing or trial of an accusatory instrument".

Although the proposed amendment to the statute is also merely an interpretive aid and not determinative, in this case it is consistent with the plain meaning of the language and the legislative history and commentary. Thus, it is persuasive and we are satisfied that the statute, as it now stands and as it read at the time of the trial in this case, does not permit suppression hearing testimony to be read at a later criminal

proceeding. Accordingly, it was error to permit the prosecutor to read the hearing testimony of Zina Everett to the jury.

■ However, we further find that the error was not of such a nature or magnitude as to require a new trial. In light of the trial court's careful redaction of the hearing testimony and of the overwhelming independent proof of the defendant's guilt, the error was harmless. The error involved a State evidentiary question and not a deprivation of a constitutional right. Accordingly, the applicable standard for determining harmlessness is whether the evidence of identity and of guilt is clear and strong *(see, People v Johnson,* 32 NY2d 814, 816). The evidence in this case more than satisfies that standard.

The defendant was identified by Donnita Bunch, who was previously acquainted with the defendant and who had ample opportunity to view him during the crime. Although Bunch did not see a knife in the defendant's hand, she saw him "punch" the deceased approximately three times in the area of the left side of the chest, and she described a movement of the defendant's forearm which can only be characterized as a stabbing motion. Moreover, her testimony was corroborated by the findings of the Medical Examiner.

In addition, three witnesses, two of whom were friends of the defendant, established the defendant's motive to attack the deceased. The two friends also described the defendant's efforts to round up assistance for the purpose of seeking revenge against the deceased and Barrett and placed the defendant at the scene of the fatal stabbing. Indeed, the defendant, through his attorney, conceded his presence in the lobby and that his purpose there was to engage McKinley and Barrett in a fight. The defense theory that the deceased could have been stabbed when the assault continued outside the building is unsupported by any evidence and is, in fact, contradicted by the testimony of the eyewitnesses who described the scene outside as one involving the assailants shooting after the fleeing victims. Furthermore, the speculation that McKinley was stabbed while en route to the hospital is unfounded and undermined by the testimony establishing that McKinley and Barrett arrived at the hospital no more than a few minutes after their flight from the lobby. "In short, a realistic appraisal of the evidence confirms that the admission of the [prior testimony] was harmless error since there was no reasonable probability that [the testimony] would have altered the result of the trial" *(People v Nocella,* 129 AD2d

653, 654, *lv denied* 70 NY2d 715; *see also, People v Mobley,* 56 NY2d 584, 585-586).

## IV

The second category of improperly admitted evidence was the redacted extrajudicial statements to police detectives of two separately tried codefendants, James Ortiz and Danny Mercado. The defendant had been jointly indicted with these two alleged accomplices. Before trial, the defendant moved for a separate trial on the ground that the admission of the codefendants' confessions implicating the defendant at a joint trial would violate the Confrontation Clause of the Sixth Amendment. In response, the People argued that the motion was premature and that the potential constitutional barrier to a joint trial could be alleviated by redaction of the statements. The defendant then submitted an additional memorandum of law which discussed at length the confrontation issue which has come to be commonly known as a *Bruton* problem *(see, Bruton v United States,* 391 US 123), and the undue prejudice which might result from admission of even a redacted form of the codefendants' confessions. The trial court denied the severance motion, holding that prejudice to the defendant could be avoided by redaction of the statements of Ortiz and Mercado.

Approximately one week later, jury selection began. After 12 jurors had been selected, the trial court granted motions for a mistrial by Ortiz and Mercado, and the trial continued against the defendant alone. Prior to the testimony of Detective Andrew Cavallo, who had interviewed James Ortiz following his arrest two days after the crime, defense counsel objected to the admission of Ortiz's statement on the grounds that it was a *"Bruton* problem" and "hearsay". Counsel also argued that the redaction was inadequate because the statement still inferentially implicated the defendant. The court overruled the objection and admitted a redacted version of the statement which, in substance, related that on the date in question, Ortiz's friends, Villar and Santiago, came to his house and told him that another friend "had been beat up by four other guys and they wanted to get even". Ortiz stated to Detective Cavallo that he had agreed to drive the friend to Buena Vista Park where they picked up two more people and that he then drove them to School Street. Ortiz further stated that he had remained in the car while the others entered the apartment building. Shortly thereafter, he heard shots and

two people ran back to his car. One of these persons stated to Ortiz that he "paid them back" and that "he had stabbed him". The other person, known to Ortiz as "Lucan", showed Ortiz a pistol but said that he had been hit with a bottle and "didn't have a chance to shoot".

With respect to Mercado's statement, which was offered through the testimony of Detective Anthony Souza following the admission of Ortiz's statement, counsel made no further objection. The detective testified that two days after the crime, Mercado told the detective that he had been present at the School Street incident and that "we had a fight" during which he (Mercado) had been hit in the head with a bottle and someone had been stabbed.

■ Defense counsel subsequently moved for a mistrial on the ground that both codefendants' statements were improperly admitted and, alternatively, requested that the jury be instructed that the statements were "only admitted to show that other people admitted they committed the crime". The court denied the mistrial motion but stated that it would include a "limit[ing] instruction" in the charge. The court repeated its position that, with respect to both codefendants' statements, there was no "Sixth Amendment problem". Ultimately, the court instructed the jury that "the statements of Daniel Mercado and James Ortiz were admitted for a limited purpose, that purpose being to establish the allegation in the indictment that a number of individuals were aiding, abetting and acting in concert with each other in the commission of these alleged crimes". Thus, the jury was improperly permitted to consider the statements of the nontestifying codefendants in determining the defendant's guilt or innocence.

Following the jury's finding of guilt, defense counsel moved, pursuant to CPL 330.30, for an order setting aside the verdict on the ground, *inter alia,* that he was denied a fair trial by the admission of the codefendants' statements. In response, the prosecution argued that the statements were properly admitted under two exceptions to the hearsay rule—res gestae and declarations against penal interest. In a written decision and order dated January 10, 1984, the trial court held: "With respect to the second ground alleged, the redacted statements and their admissibility had been argued and reargued by all counsel at pre-trial hearings and prior to their ultimate admission at trial. This Court ruled that the statements were admissible on the grounds that they were res gestae statements establishing the theory of 'aiding and abetting' as

charged in this indictment. Moreover, they were admissible as declarations against penal interest *(see, People v Brown,* 26 NY2d 88; *People v Settles,* 46 NY2d 154)".

█ Thus, initially, we reject the prosecution's claim that, as to both statements, the defendant failed to preserve his claim that his right to confrontation was violated and, with respect to Mercado's statement, that the defense also failed to preserve the evidentiary (hearsay) objection. As revealed by the history of defense counsel's motions and objections, both the constitutional and evidentiary objections to the statements were adequately and repeatedly brought to the trial court's attention. The defendant's protests were sufficient to make his position with respect to both statements known to the trial court (CPL 470.05 [2]). The defendant's severance motion alerted the court to the constitutional implications of admitting in evidence statements of nontestifying codefendants *(see, People v Lopez,* 68 NY2d 683, 685; *People v Boone,* 22 NY2d 476). The underlying premise of the motion was that, at a joint trial, hearsay, i.e., the codefendants' statements to the police would be submitted to the jury pursuant to the admission exception to the rule against hearsay, without the safeguard of cross-examination. Indeed, a *Bruton* problem presupposes an offer of hearsay evidence.

Furthermore, assuming, arguendo, that for the purposes of preservation of error for appellate review it was necessary to articulate separately the evidentiary aspect of a *Bruton* problem *(see, People v Qualls,* 55 NY2d 733, 734; *People v Perone,* 119 AD2d 838, 839, *lv denied* 68 NY2d 671), that was done in this case. Defense counsel specifically directed the court's attention to *People v Geoghegan* (51 NY2d 45) and *United States v Sarmiento-Perez* (633 F2d 1092). In those cases, the courts addressed the hearsay barriers to admission of a separately tried codefendant's confession, i.e., whether the confession qualified as a declaration against penal interest. In each case, the court concluded that the confessions did not so qualify and declined to consider whether the defendant's right of confrontation guaranteed by the Sixth Amendment had been violated *(see, People v Geoghegan, supra,* at 47-48; *United States v Sarmiento-Perez, supra,* at 1093). The defendant's express reliance on the holdings of these cases was sufficient to apprise the court of the grounds for his opposition to the admission of the statements. "The mere emphasis of one prong of attack over another or a shift in theory on appeal,

will not constitute a failure to preserve" *(People v De Bour,* 40 NY2d 210, 215).

■ With respect to the merits of this claim, the People have commendably abandoned their theory that Ortiz and Mercado's statements were admissible as part of the res gestae. Although this concept eludes "precise and comprehensive definition" *(see,* Richardson, Evidence § 279 [Prince 10th ed]), and, indeed, its existence as a separate class of exempted hearsay is questionable *(see,* Fisch, New York Evidence, § 1001 [2d ed]), the statements in the instant case, which were completely lacking in spontaneity and which were not made contemporaneously with the events described in the statements, could not conceivably be labeled res gestae *(see, People v Steel,* 130 AD2d 601, 602, *lv denied* 70 NY2d 706).

■ Furthermore, the People also concede that classification of the statements as declarations against penal interest is "problematic, the difficulty being their reliability". In fact, application of the well-established law of New York to the statements at issue in the instant case unequivocally demonstrates that the statements do not qualify as declarations against penal interest and were improperly admitted in evidence against the defendant. Recently, in *People v Brensic* (70 NY2d 9), the Court of Appeals reiterated the following four prerequisites which must be satisfied before the statement of a nontestifying third party is admissible as a declaration against penal interest: "(1) the declarant must be unavailable to testify by reason of death, absence from the jurisdiction, or refusal to testify on constitutional grounds; (2) the declarant must be aware at the time of its making that the statement was contrary to his penal interest; (3) the declarant must have competent knowledge of the underlying facts; and (4) there must be sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability" *(People v Brensic, supra,* at 15; *see also, People v Shortridge,* 65 NY2d 309; *People v Settles,* 46 NY2d 154; *People v Maerling,* 46 NY2d 289).

The statements of Ortiz and Mercado fall short of satisfying these criteria in a number of respects. First, there was no affirmative showing that either Ortiz or Mercado was "unavailable to testify by reason of death, absence from the jurisdiction, or refusal to testify on constitutional grounds" *(People v Brensic, supra,* at 15). Although the People assert that the defense conceded the unavailability of these witnesses, no such concession is contained in the record. The

People rely on an affirmation of an Assistant District Attorney submitted in opposition to the defendant's CPL 330.30 motion which contains this same assertion but, again, without citation to the record. The prosecution has, therefore, failed to substantiate its claim that this issue was conceded.

Furthermore, although Ortiz and Mercado could have asserted their Fifth Amendment privilege against self-incrimination and thereby rendered themselves unavailable, in the absence of any evidence, an assertion of the privilege cannot be presumed. "When the People seek to introduce the declaration against penal interest of an unavailable third party to inculpate a defendant, through the testimony of an in-court witness, and the defendant claims that such evidence is unreliable, the trial court should conduct a hearing, if there is any dispute concerning the circumstances, to determine whether the criteria for admissibility are actually satisfied" *(People v Brensic, supra,* at 16). In *People v Settles* (46 NY2d 154, 167, *supra),* the court noted that the unavailability criterion would be satisfied if the witness were to once again invoke his right against self-incrimination when called as a witness at the defendant's new trial. In this case, no hearing was held and no express ruling was made by the court as to the unavailability of the witnesses. Therefore, it would be mere speculation, in which we decline to indulge, for this court to conclude that the declarants were unavailable *(see, People v Thomas,* 68 NY2d 194, 196 [declarant, at a hearing outside the presence of the jury, refused to answer any questions and asserted his Fifth Amendment privilege]; *People v Brown,* 26 NY2d 88, 91 [declarant called as a defense witness and refused to answer questions on constitutional grounds]; *People v Davis,* 122 AD2d 889, 890 [trial court properly excluded hearsay statement where the proponent failed to establish the prerequisite of the declarant's unavailability]; *People v Nicholson,* 108 AD2d 929, 930 [the party opposing admission of the statement conceded the unavailability of the declarant who had absconded]).

Having determined that the first prerequisite for admission of a statement as a declaration against penal interest was not met, lengthy discussion of the remaining three criteria is unnecessary. It is sufficient to note that, with respect to Ortiz's statement, the People also failed to rebut the "presumption of unreliability" which arises "when the inculpatory declaration is the result of custodial questioning because, in such circumstances, the declarant is likely to have a 'strong motive to falsify' in order to curry favor, shift blame, receive

immunity from prosecution or obtain a favorable plea bargain" *(People v Brensic, supra,* at 15). In his statement, Ortiz clearly sought to minimize his role in this crime and shift blame elsewhere by indicating that he drove a certain person to a location to "get even" but never left his car during the altercation and did not see any weapons until after the fact. Similarly, Mercado, who was not under arrest at the time of his initial statement, admitted only to being involved in a fight during which he was hit with a bottle and someone else was stabbed. Both statements were in marked contrast with the roles of the declarants as described by the eyewitnesses at trial. These circumstances indicate a substantial motive to fabricate and raise serious doubts as to the reliability of the statements *(see, e.g., People v Abdullah,* 134 AD2d 503, 504-505, *lv denied* 71 NY2d 965; *People v Trice,* 101 AD2d 581, 583; *see also,* Fisch, New York Evidence §§ 899, 901 [2d ed]).

In addition, we note that the trial court failed to redact portions of the statement which were not against the declarants' interest *(see, People v Thompson,* 129 AD2d 655, 657). Only those parts of a declaration against penal interest which inculpate the declarant should be admitted *(see, People v Geoghegan,* 51 NY2d 45, 49, *supra).*

## V

Having determined that the codefendants' statements were improperly admitted as a matter of State evidentiary law, we now turn to the question of whether this admission violated the defendant's right to confront and cross-examine witnesses against him as guaranteed by the United States and New York State Constitutions (US Const 6th Amend; NY Const, art I, § 6). It is well established that under both the State and Federal Constitutions, if evidence is admissible under an exception to the hearsay rule, it may be received without violating the Confrontation Clause if a two-part test is satisfied. First, the declarant must be unavailable at the time of trial. Second, the statement must bear sufficient "indicia of reliability" *(Ohio v Roberts,* 448 US 56, 65-66; *People v Sanders,* 56 NY2d 51, 64-65, *rearg denied* 57 NY2d 674; *People v Grant,* 113 AD2d 311, 315, *lv denied* 67 NY2d 762). As previously discussed, the statements at issue here fail to satisfy either criterion. Thus, if Ortiz's and Mercado's statements implicated the defendant, their admission into evidence constituted a violation of the Confrontation Clause *(see, e.g., People v Crampton,* 107 AD2d 998, 999).

A proper resolution of this issue must take into consideration the sufficiency of the redaction of the challenged statements. The statements at issue contained no express reference to the defendant. Furthermore, Mercado's statement does not inferentially implicate the defendant. Thus, the only potential source of prejudice to the defendant from these statements is the portion of Ortiz's statement indicating that one of the participants in the assault told him (Ortiz) that he "paid them back" and that "he had stabbed him". In the context of the testimony of Eileen Morgan, Franklin Villar and James Santiago establishing a motive for the defendant to seek revenge against Barrett and McKinley, an incriminating inference could be drawn from this portion of Ortiz's statement.

The settled law of New York is that the prosecution bears the burden of "effective redaction" *(People v Wheeler,* 62 NY2d 867, 869). Redaction is ineffective when, despite the elimination of the defendant's name, the confession "could only be read by the jury as inculpating [the] defendant" *(People v Wheeler, supra,* at 869). However, if the jury has been properly instructed, the mere possibility of incrimination in the context of all the evidence of the trial is insufficient to render the redaction ineffective *(see, Richardson v Marsh,* 481 US 200; *People v Marcus,* 137 AD2d 723, *lv denied* 72 NY2d 862).

In this case, the court instructed the jury that it could consider the codefendants' statements for the "purpose [of determining] the allegation in the indictment that a number of individuals were aiding, abetting and acting in concert with each other in the commission of these alleged crimes". The court also explained the concept of acting in concert as defined in Penal Law § 20.00. The indictment charged the defendant on an acting in concert theory, and the various counts were submitted to the jury on that basis.

■ Thus, it is clear that the proper limiting instructions, which are a necessary prerequisite to a finding that contextual incrimination from a codefendant's statement did not violate the Confrontation Clause, were not given in this case. The holding of the United States Supreme Court in *Richardson v Marsh (supra),* was founded on the proposition that "with regard to inferential incrimination the judge's instruction [to disregard the evidence] may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget" *(Richardson v Marsh, supra,* 481 US, at 208). In this case,

the trial court's instructions permitted an incriminating inference with respect to Ortiz's statement; and, to that extent, a constitutional violation occurred.

However, as stated above, the independent evidence of the defendant's guilt was overwhelming; and, therefore, the error in admitting the codefendant's statements was harmless beyond a reasonable doubt *(see, People v Crimmins,* 36 NY2d 230, 237). A review of both statements reveals that they were of minimal probative value with regard to proof of the guilt of this defendant *(see, People v Graham,* 90 AD2d 198, 205, *cert denied* 464 US 896). There is no reasonable possibility that the erroneously admitted evidence might have contributed to the defendant's conviction.

THOMPSON, J. P., BROWN and SULLIVAN, JJ., concur.

Ordered that the judgment is affirmed.