Neftali AYALA, Petitioner–Appellant,

v.

Arthur LEONARDO, Warden, Great Meadows Correctional Facility, Respondent–Appellee.

No. 1059, Docket 92–2751.

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1994.

Decided April 4, 1994.

---

Theodore S. Green, White Plains, NY (Green & Willstatter, of counsel), for petitioner-appellant.

John J. Gibson, Asst. Dist. Atty. of Westchester County, White Plains, NY (Carl A. Vergari, Dist. Atty., Joseph M. Latino, Asst. Dist. Atty., of counsel), for respondent-appellee.

Before OAKES, KEARSE, and CARDAMONE, Circuit Judges.

OAKES, Senior Circuit Judge:

Neftali Ayala appeals from a judgment of the United States District Court for the Southern District of New York, Vincent L. Broderick, *Judge,* dismissing his *pro se* petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254 (1988). His petition for a writ of habeas corpus challenges his convictions for murder in the second degree, N.Y.Penal Law § 125.25, subdiv. 1 (McKinney 1987), and attempted assault in the first degree, N.Y. Penal Law §§ 110.00, 120.10 (McKinney 1987). At issue is the admissibility of three out-of-court statements.

We affirm the district court's judgment holding that although two of the statements were wrongly admitted in violation of federal constitutional law, their admission constituted harmless error in each instance.

We now set forth the background facts of this case without the use of the wrongly admitted evidence. We then set forth the contents of the inadmissible evidence.

I.

*Background*

On Sunday, March 21, 1982, at approximately 9 p.m., three friends, James McKinley, Thomas Barrett, and Eileen Morgan, were loitering on Palisade Avenue in Yonkers, New York. Transcript of Trial at 50–51, *People v. Ayala,* Indictment No. 454/82 (Nov. 10–18, 1983) ("Transcript"). At about the same time, Neftali Ayala (a.k.a. "Shock"), together with Frank Villar and James Santiago, was walking along Palisade Avenue. McKinley and Barrett left Morgan and approached Ayala. Upon meeting, Barrett asked Ayala whether there was any trouble between McKinley and him. Ayala responded by hitting McKinley. Transcript at 51–52, 118, 216–17.

Ayala and Barrett began to fight and fell to the ground. McKinley then kicked Ayala in the face. *Id.* at 119–20, 218–19. Ayala stood up, removed his belt, and used it to strike Barrett. McKinley and Barrett retreated. *Id.* at 120. The antagonists exchanged words and another fight between Ayala and Barrett ensued. *Id.* at 121, 221. During the fight, Barrett produced a long metallic object, identified as either a knife or an ice pick. *Id.* at 122, 222. This time, Ayala, Villar, and Santiago retreated. *Id.*

Ayala and his companions ran over to the home of James Ortiz (a.k.a. "Cuch") to enlist him in an attack on McKinley and Barrett. For additional support, the group drove in Ortiz's green car to search for Danny Mercado (a.k.a. "Lucan"). The group located Mercado and his friend, Robert Ramos (a.k.a. "Baretta"), both of whom jumped into Ortiz's car and joined in the planned attack. The group stopped briefly at Mercado's home, but the driver, Ortiz, refused to drop off Villar or Santiago. The six men subsequently drove around hunting for McKinley and Barrett. Transcript at 122–24, 135–39, 222–28.

In the meantime, McKinley and Barrett rejoined Morgan, who had fled to Barrett's home at 4 Schroeder Place, Yonkers, when the fight erupted. After spending some time at Barrett's home, the friends left for Morgan's apartment at 55 School Street, Yonkers.

At approximately 10:30 p.m., McKinley, Barrett, and Morgan arrived at 55 School Street. At that time, Donnita Bunch and Zita Everett were socializing in the lobby of the building. McKinley and Barrett walked Morgan up to her apartment on the sixth floor, and then returned to the lobby. They stopped to talk to Bunch and Everett, with whom they were acquainted. Bunch and Everett were standing close together, near the mailboxes, as they spoke with McKinley and Barrett. McKinley, who stood near the entrance, was only five feet from the two young women. *See* Transcript at 96–102.

The lobby is approximately 5 feet wide by 20 feet long. Directly opposite the front entrance are two elevators and a stairwell which provides access to the rear of the building. Individualized mailboxes are in the wall to the right. On both sides of the elevators are short hallways where apartments are located. Two overhead light fixtures, one in the center of the ceiling and the other in front of the elevators, illuminate the lobby. The short hallways each have two ceiling light fixtures. All lights were functional that evening. Four outside light fixtures illuminate the outside of the building. A street lamp is directly across the street from the building's entrance.

At this point, Ayala and his companions spotted Barrett and McKinley in the lobby. Transcript at 141, 228–29. They parked their car on the side of the apartment building, out of the sight of those in the lobby. They then entered through the rear, rushing through the stairway door into the lobby. *Id.* at 141–42, 229. Ayala was the first one through, followed by Ortiz, Mercado, and Ramos. *Id.* at 143, 231. Villar and Santiago stayed behind.

The young women recognized Ayala from high school, and noticed that he had a scrape on his face. Transcript at 106. They watched as Ayala jumped on top of McKinley striking him with his right hand three times in the area of his left breast. According to Bunch, Ayala delivered the blows with his "fist raised with the bottom portion of the hand facing forward and using the elbow as a fulcrum." *Id.* at 105.

Ayala's companions began to shoot at McKinley and Barrett. *Id.* at 108, 146. The young women ran away from the direction of the shooting into one of the hallways. When it quieted, the young women returned to the lobby. No one was there by that time. *Id.* at 107–08.

Before the attack, Morgan went to her window to watch McKinley and Barrett leave. As she watched for her friends, she noticed a car in front of the building. She watched the car drive past the building and park. She saw Ayala with a scrape on his face. Shortly thereafter, she heard gunshots. She then watched McKinley and Barrett flee the building as they were chased by someone with a gun. One of the pursuers, Ortiz, stopped, held his gun with arms extended and shot. Transcript at 146. McKinley and Barrett jumped into a car and sped off. The four pursuers went back into their car and left. *Id.* at 56–59.

McKinley and Barrett arrived at Yonkers General Hospital Emergency Room at 11 p.m. *Id.* at 160. McKinley had no pulse and no blood pressure. He suffered from massive internal bleeding caused by a stab wound to his left chest which punctured his heart, and a stab wound to the back which punctured his lung. He also suffered from other less severe injuries including a gun shot wound to his left shoulder and an abrasion on the right side of his back. The hospital pronounced McKinley dead at 11:45 p.m. *Id.* at 160–62.

Barrett suffered from a single gun shot wound caused by a bullet which entered the right side of his back and then exited through his abdomen. *Id.* at 163. He was admitted to the hospital where he underwent emergency surgery. Although Barrett survived the injury, he died of unrelated causes prior to the hearings and trial held in this matter. *Id.* at 339.

The emergency room staff who treated McKinley found one .22 calibre bullet in his clothing. Later, the hospital coroner recovered a second .22 calibre bullet from his body during the autopsy. Both slugs, together with a third one discovered in the lobby entrance, were fired from the same .22 calibre gun. Two shell castings from a .25 cali-

bre semi-automatic pistol also were recovered at the murder scene.

## II.

### *The Evidence Admitted in Error*

At trial, three out-of-court statements were wrongly admitted into evidence: (1) a written statement by Ortiz, (2) an oral statement by Mercado, and (3) the prior testimony of Everett. Intentionally omitted from the above synopsis is any consideration of these improperly admitted pieces of evidence. We now take each piece of evidence in turn.

### A. The Ortiz Statement

Police arrested Ayala several hours after McKinley died. Two days later, on March 23, 1982, Ortiz voluntarily surrendered to Yonkers Police. After being advised of his rights, and having acknowledged his understanding of his rights, Ortiz dictated a statement to police which was reduced to writing and then executed by him. A redacted version of this out-of-court statement was admitted into evidence (the "redacted Ortiz statement"). The redacted Ortiz statement read:

On March 21, 1982, I was at home at 179 Ashburton Ave., when two friends of mine, Frank (Mase), Jimmy came to my house. They told me that another friend had been beat up by four other guys and they wanted to get even. They asked me if I would drive some other people to pick up two of his friends and take them to School St. I agreed, and went downstairs where we met him. At this time Frank and Jimmy left, walking away. I then drove him down to Buena Vista Park where we met two of his friends, one I know as 'Lucan 1', and the other one I did not know. He asked me to drive to 55 School St., and as we drove, one person said that he had a knife, and another person said that he had something, but I did not know what at the time.

When we got to 55 School St., one person told me to drive to the front of the building, and when we looked in I saw three black people standing inside the lobby. One person said "That was one of them with the hat" and he told me to drive

around the corner and park. They all got out of the car and walked to the front entrance of the building. A few seconds later, I heard two shots, and two people ran back to the car, and got in, told me to drive away. As we drove away, one person said to me that he paid them back, and he had stabbed him. He also told me that someone shot a gun after he stabbed a guy but he didn't say who. He said that 'Lucan' didn't have a chance to shoot as he got hit with a bottle by the guy he grabbed. 'Lucan' then showed me a pistol, and said that he has to get rid of it before he gets involved. I asked them where the other guy went and they told me that he ran away in the other direction. They told me to drive them home, and as I was driving down South Broadway they told me to drop them in front of the Park Hill theatre, and said that they would walk home from there. After I dropped them off I drove home.

Redacted Ortiz statement, Exhibit 14 to State Memorandum of Law filed in District Court on 7/18/91, Appellant's Brief at 8–10.

Thus, according to the redacted Ortiz statement, a friend (presumably Ayala) of Frank (Villar) and Jimmy (Santiago) had been beaten up and so they wanted revenge. Thus, Ortiz drove the friend to Buena Vista Park to pick up two more people (presumably Mercado and Ramos) and then on to 55 School Street, where he parked the car. Ortiz stated that he remained in the car while the others entered the apartment building. Shortly thereafter, he heard shots and two people ran back to his car. One stated that he had stabbed one of them. The other, "Lucan," (Mercado) showed Ortiz a gun. Other than Ortiz's self-serving statement that he remained in the car while the others took revenge, this statement does not reveal anything different from the above composite of eyewitness accounts of events.

Counsel for Ayala unsuccessfully argued that the redacted Ortiz statement constituted inadmissible hearsay and violated Ayala's constitutionally protected Sixth Amendment right to cross-examine an adverse witness. U.S. Const. amend. VI; *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622,

20 L.Ed.2d 476 (1968) (admission of co-defendant's extrajudicial statements into evidence during a joint trial violates the other defendant's right of cross-examination "secured by the Confrontation Clause of the Sixth Amendment"). Counsel also argued that redaction was not an effective remedy.

## B. The Mercado Statement

On March 24, 1982, the day after Ortiz surrendered to police, Mercado telephoned Yonkers Police Detective Souza, identifying himself as "Lucan." Transcript at 200. The following day, on March 25, 1982, Detective Souza met with Mercado. During this meeting, Mercado acknowledged the previous day's telephone conversation. Furthermore, Detective Souza recognized Mercado's voice as that of the man who identified himself as Lucan on the previous day's phone call. Transcript at 201. According to Detective Souza, Mercado asked Detective Souza why the police had been to his home looking for him. The detective explained that the visit concerned the "School Street" incident. Mercado admitted that he was present at the scene, stating that he had been hit with a bottle and that someone was stabbed. According to Souza's testimony, Mercado stated: "he was there, we had a fight and that he got hit on the head with a bottle, and that someone got stabbed." Transcript at 202 (paraphrasing conversation with Mercado).

Counsel for Ayala requested that the court give a limiting instruction to the effect that the redacted Ortiz statement and the oral Mercado statement were admitted only "to show that other people admitted they committed the crime." Transcript at A–314. The judge did not give such a limiting instruction but instead advised:

> I instruct you that the statements of Daniel Mercado and James Ortiz were admitted for a limited purpose, that purpose being to establish the allegation in the indictment that a number of individuals were aiding, abetting and acting in concert with each other in the commission of these alleged crimes. I instruct you that you are

to consider these statements for no other purpose.

Transcript at 389.

## C. The Prior Testimony of Zina Everett

At the time of trial, Zina Everett could not be located. The prosecution sought to introduce a redacted version of her prior testimony given at a pre-trial hearing held pursuant to *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). *See* N.Y.Crim.Proc.Law §§ 670.10 (setting forth the circumstances under which prior testimony given by a witness who is now unavailable may be used in a criminal proceeding) and 670.20 (establishing the procedures under which such testimony may be used) (McKinney 1984). Although none of the section 670.10 circumstances existed, the court held a hearing to determine the availability of Everett. The court determined that Everett was unavailable and permitted the prosecution to introduce her pre-trial *Wade* hearing testimony as evidence on the ostensible authority of section 670.10.

The New York Court of Appeals subsequently found that the admission of Everett's *Wade* hearing testimony under a New York statutory exception to the hearsay rule contained in section 670.10 was improper under New York state law. Nevertheless, the court found that the admission of this evidence constituted harmless error.

Everett's *Wade* hearing testimony, *see* Transcript at 301–36, paralleled Bunch's testimony, *see* Transcript at 96–112. The only notable differences are two-fold: (1) Everett testified that she saw Ayala "punch" McKinley eight, rather than three, times in the left chest, *see* Transcript at 308–09, 313; and (2) Everett testified that she saw an object in Ayala's "punching" arm. Transcript at 318–19. Everett also stated that the type of "weapons" she observed in the hands of the other perpetrators were guns. Transcript at 333.

## III.

### Procedural History

Neftali Ayala and co-defendants Ortiz, Rodriguez, Mercado, and Ramos were each

charged with (1) aiding and abetting each other, (2) murder in the second degree, (3) two counts of criminal possession of a weapon in the second degree, (4) two counts of criminal possession of a weapon in the third degree, (5) two counts of criminal possession of a weapon in the fourth degree, (6) two counts of criminal use of a firearm in the second degree, (7) attempted murder in the second degree, (8) two counts of attempted assault in the first degree, (9) two counts of assault in the second degree, and (10) criminal use of a firearm in the first degree.

After pretrial hearings for Ayala, Ortiz, Rodriguez, Mercado, and Ramos, the Westchester County Court suppressed the statements of all defendants other than the written Ortiz statement and the oral Mercado statement made by telephone to Detective Souza. Consequently, the prosecution moved to dismiss charges against Rodriguez and Ramos.

During jury selection, Ayala's prosecution was severed from the prosecution of his two remaining co-defendants. Ultimately, the only counts against Ayala that were submitted to the jury were (1) murder in the second degree (and lesser included offenses) of victim McKinley, and (2) the alternatives of attempted murder in the second degree or attempted assault in the first degree of victim Barrett.

On November 18, 1983, following trial, a jury convicted Ayala of murder in the second degree, N.Y. Penal Law § 125.25, subdiv. 1, and attempted assault in the first degree, N.Y. Penal Law §§ 110.00, 120.10. On November 25, 1983, Ayala filed a motion to set aside the verdict, which the County Court subsequently denied. On January 24, 1984, a county clerk entered a judgment of the County Court of the County of Westchester, State of New York, Colabella, *Judge*. The court sentenced him to (1) fifteen years to life for the crime of murder in the second degree, and (2) one to three years for the crime of attempted assault in the first degree. The court ordered the sentences to run concurrently.

Appeal was taken to the Appellate Division which affirmed the convictions. *People v. Ayala*, 142 A.D.2d 147, 534 N.Y.S.2d 1005 (2d Dept.1988) (holding that the admission of the Ortiz and Mercado statements amounted to constitutional violations, and that the admission of the Everett testimony amounted to a non-constitutional violation, but that the admission of this evidence constituted harmless error beyond a reasonable doubt). Ayala then appealed to the Court of Appeals which also affirmed. *People v. Ayala*, 75 N.Y.2d 422, 431–32, 554 N.Y.S.2d 412, 416–17, 553 N.E.2d 960, 964–65 (1990) (citing *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967)).

Ayala then petitioned for a writ of habeas corpus to the United States District Court for the Southern District of New York, Vincent L. Broderick, *Judge*. The district court referred the petition to a magistrate judge. On November 26, 1991, the magistrate judge filed a report and recommendation. According to the report, the magistrate judge found that the trial court erroneously admitted the redacted Ortiz statement and the Mercado statement but that these errors were harmless beyond a reasonable doubt. The magistrate judge also found that the admission of the Everett statement, while violative of New York State evidentiary laws, did not offend federal law. The magistrate judge therefore factored in the Everett statement in concluding that the admission of the redacted Ortiz statement and the Mercado statement amounted to harmless error. On October 1, 1992, the district court dismissed by memorandum order pursuant to 28 U.S.C. § 2254. On October 20, 1993, Ayala filed a notice of appeal. On September 1, 1993, this court granted a certificate of probable cause and on September 3, this court appointed counsel for Ayala.

## IV.

### *Jurisdiction*

The district court had jurisdiction under 28 U.S.C. §§ 2241, 2254 (1988). This court has jurisdiction under 28 U.S.C. § 2253 (1988).

## V.

### *Standard of Review*

In *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, the Supreme Court held that the stan-

dard on direct appellate review for determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt." The Court left open the question whether the *Chapman* harmless-error standard applies on collateral review.

This question had been addressed by several circuits which had adopted the *Chapman* harmless-error standard on collateral review. *See Lowery v. Collins,* 988 F.2d 1364, 1372–73 (5th Cir.1993) (*Chapman* harmless-error standard governs in Confrontation Clause violations on collateral review); *Duest v. Singletary,* 967 F.2d 472, 481 & n. 10 (11th Cir.1992) (same for Eighth Amendment violation); and *Bass v. Nix,* 909 F.2d 297, 304 (8th Cir.1990) (same for *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) violations on collateral review). The Seventh Circuit, however, adopted the *Kotteakos* harmless-error standard to review *Doyle* violations on collateral review. *Brecht v. Abrahamson,* 944 F.2d 1363, 1375 (7th Cir.1991). The Supreme Court granted certiorari in *Brecht* to resolve this conflict. *Brecht,* 944 F.2d 1363 (7th Cir.1991), *cert. granted,* —— U.S. ——, 112 S.Ct. 2937, 119 L.Ed.2d 563 (1992), *aff'd,* —— U.S. ——, ———–——, 113 S.Ct. 1710, 1713–14, 123 L.Ed.2d 353 (1993) ("whether the *Chapman* harmless-error standard applies in determining whether the prosecution's use for impeachment purposes of petitioner's post-*Miranda* silence, in violation of due process under *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), entitles petitioner to habeas corpus relief").

Specifically, the Court held that the *Chapman* standard did not apply. "Instead, the standard for determining whether habeas relief must be granted is whether the *Doyle* error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht,* —— U.S. at ——, 113 S.Ct. at 1714 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). The Court explained that "[t]he *Kotteakos* harmless-error standard is better tailored to the nature and purpose of collateral review than the *Chapman* standard, and application of a less onerous harmless-error standard on habeas promotes the consider-

ations underlying our habeas jurisprudence." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1714. Later on, the Court further explained its conclusion: "we think *Doyle* error fits squarely into the category of constitutional violations which we have characterized as ' "trial error." ' ... Trial error 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may ... be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].' " *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 280, 111 S.Ct. 1246, 1249, 113 L.Ed.2d 302 (1991)).

There has been some doubt about who bears the burden of proof on collateral review under the *Brecht/Kotteakos* standard. *Compare Kotteakos,* 328 U.S. at 760, 66 S.Ct. at 1245 (" '[i]f the error is of such a character that its natural effect is to prejudice a litigant's substantial rights, the burden of sustaining a verdict ... rest[s] upon the [prosecution]' ") (citations omitted); *Brecht,* —— U.S. at ——, 113 S.Ct. at 1723 (Stevens, J., concurring) ("*Kotteakos* plainly stated that unless an error is merely 'technical,' the burden of sustaining a verdict by demonstrating that the error was harmless rests on the prosecution. A constitutional violation, of course, would never fall in the 'technical' category") (footnote omitted); *Stoner v. Sowders,* 997 F.2d 209, 213 (6th Cir.1993); *Smith v. Dixon,* 996 F.2d 667, 676–77 n. 13 (4th Cir.1993); John H. Blume & Stephen P. Garvey, *Harmless Error in Federal Habeas Corpus After* Brecht v. Abrahamson, 35 Wm. & Mary L.Rev. 163, 166–69 (1993); *with Brecht,* —— U.S. at ——, 113 S.Ct. at 1722 (Rehnquist, C.J., majority opinion) (under the *Kotteakos* standard, "*habeas petitioners* may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice' ") (emphasis added) (quoting *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)); *Samuels v. Mann,* 13 F.3d 522, 526 (2d Cir.1993) (in dicta, quoting the majority opinion in *Brecht,* but not directly addressing the question of who bears the burden of explaining why a

*constitutional* error was harmless); *Castillo v. Stainer,* 997 F.2d 669, 669 (9th Cir.1993), *modifying,* 983 F.2d 145 (9th Cir.1992); *Henry v. Estelle,* 993 F.2d 1423, 1427 (9th Cir. 1993); *Cumbie v. Singletary,* 991 F.2d 715, 724 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993). However, we need not resolve the burden-of-proof issue at this time because even in applying the *Kotteakos* harmless-error standard, and reviewing the record *de novo* to determine "whether the error influenced the jury's deliberations," *Brecht,* —— U.S. at ——, 113 S.Ct. at 1723 (Stevens, J., concurring), we conclude that the error was harmless.

■ In this case, Ayala has petitioned the district court for habeas corpus relief because of two federal constitutional trial errors. *Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622. Confrontation Clause errors such as those alleged here are subject to harmless error analysis. *See, e.g., Cruz v. New York,* 481 U.S. 186, 194, 107 S.Ct. 1714, 1719, 95 L.Ed.2d 162 (1987); *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). We therefore apply the *Kotteakos* standard of review. *Samuels v. Mann,* 13 F.3d 522, 525 (2d Cir.1993) (applying *Kotteakos* standard of review on collateral review of Confrontation Clause error). Applying this standard, we conclude that Ayala is not entitled to habeas corpus relief.

## VI.

### *Discussion*

Ayala asks us to examine whether the admission of the three pieces of evidence, (1) the redacted Ortiz statement, (2) the oral Mercado statement, and (3) Everett's pre-trial *Wade* testimony, violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241. This examination requires us to answer two questions regarding each piece of evidence: (1) whether the admission of the evidence violated federal constitutional law, and (2) if so, whether the admission was nevertheless harmless. *See Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253 (evidence is not harmless if it effected actual prejudice resulting in "substantial and injurious effect or influence in determining the jury's verdict").

We conclude that although the admission of the redacted Ortiz statement and the Mercado statement violated federal constitutional law, their admission constituted harmless error. On the other hand, while the admission of Everett's pre-trial *Wade* testimony violated New York state evidentiary law, the error did not rise to the level of a federal constitutional violation. *Estelle v. McGuire,* —— U.S. ——, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (" 'federal habeas corpus relief does not lie for errors of state law' ") (quoting *Lewis v. Jeffers,* 497 U.S. 764, 779, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990)).

For reasons that become clear, we begin our analysis with the admissibility of the Everett testimony.

### A. The Everett Testimony

■ At trial, the prosecution read Everett's pre-trial *Wade* hearing testimony into evidence. Although the admission of the pre-trial Everett testimony violated New York state law, *see Ayala,* 75 N.Y.2d at 431–32, 554 N.Y.S.2d at 416–17, 553 N.E.2d at 964–65, it did not violate Ayala's federal constitutional right to confront and cross-examine an adverse witness.

■ "[T]he Confrontation Clause reflects a preference for face-to-face confrontation at trial, and ... 'a primary interest secured by [the provision] is the right of cross-examination.' " *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980) (footnote omitted) (quoting *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965)); *Graham v. Hoke,* 946 F.2d 982, 994 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992). The *Roberts* Court continued, stating that the Confrontation Clause envisions:

> "a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."

*Id.* 448 U.S. at 63–64, 100 S.Ct. at 2537–2538 (quoting *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895)). The fact finder's independent assessment of the credibility of the witness, and the compulsion of the adverse witness to testify in the presence of the accused, are such important "means of testing accuracy ... that the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process." *Id.* 448 U.S. at 64, 100 S.Ct. at 2538 (internal quotations omitted). Nevertheless, this constitutionally prescribed preference for direct confrontation, personal examination and cross-examination can be discarded "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Maryland v. Craig,* 497 U.S. 836, 850, 110 S.Ct. 3157, 3166, 111 L.Ed.2d 666 (1990). But first, the prosecution must demonstrate the unavailability of the adverse witness. *Ohio v. Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538. Once the prosecution has demonstrated unavailability, then the prosecution must "afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement." *Id.* at 65–66, 100 S.Ct. at 2538–2539 (internal quotations omitted). This can be done where the prosecution shows that the statement falls within a firmly rooted hearsay exception or is supported by a showing of "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. at 2539.

■ These indicia of reliability required by the Confrontation Clause were present regarding the Everett testimony. Ayala was present at the *Wade* hearing, and had the opportunity to cross-examine Everett. Furthermore, the prosecution demonstrated the need to use Everett's *Wade* testimony because of her unavailability.

At any rate, Ayala does not question the decision that the error in admitting Everett's testimony was not of constitutional magnitude. Rather, Ayala questions the magistrate judge's reliance on the Everett testimony in concluding that the admission of the redacted Ortiz statement and the Mercado statement (which do rise to errors of constitutional magnitude, *see infra*) was harmless.

Ayala argues that although the error in admitting the Everett testimony may not have risen to constitutional heights, its admission was still in violation of New York state law. Therefore, a federal court has no business factoring the content of this testimony into its analysis whether the admission of the redacted Ortiz statement and the Mercado statement constituted harmless error.

We are thus faced with the additional question whether a federal court, in determining whether to grant habeas relief, can rely on the content of testimony which the state courts have expressly determined was wrongly admitted under state law to show why the admission of the constitutionally deficient evidence was harmless. Specifically, can a federal court use evidence admitted in violation of state law, such as the Everett testimony, to determine whether the admission of constitutionally deficient statements, such as the Ortiz and Mercado statements, was harmless because the other evidence against Ayala, including evidence admitted in violation of state law, amounts to overwhelming evidence of guilt? For reasons which we state in greater detail below, we conclude that the admission of the redacted Ortiz statement and the oral Mercado statement into evidence constituted harmless error because they did not effect actual prejudice resulting in "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253. Therefore, we need not answer the question whether the Everett testimony can be used in harmless-error analysis.

This leads us to a separate and distinct problem with the Everett testimony. The fact is that the jury heard the Everett testimony. By itself, it may have constituted harmless error, but we must also determine whether the admission of this testimony, in conjunction with the admission of the redacted Ortiz statement and the Mercado statement had the cumulative effect of actual prejudice resulting in a substantial and injurious effect or influence in determining the jury's verdict. Again, for reasons which we state below, we conclude that the admission of the improperly admitted evidence was harmless.

**B. The Ortiz and Mercado Statements**

■ The admission of the redacted Ortiz statement and the Mercado statement violated Ayala's sixth amendment right to cross-examine adverse witnesses contained in the Confrontation Clause of the Constitution. U.S. Const. amend. VI; *Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622; *Ohio v. Roberts,* 448 U.S. at 65–66, 100 S.Ct. at 2538–2539; *cf. Cruz,* 481 U.S. at 193, 107 S.Ct. at 1719. (holding that "where a nontestifying code-fendant's confession incriminating the defendant is not directly admissible against ·the defendant ... the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him"). The admission of the statements of these co-defendants failed to meet the indicia of reliability the Constitution requires. Specifically, the prosecution has failed to establish a need to resort to the admission of these out-of-court statements with a specific showing that the witnesses were unavailable. *Ohio v. Roberts,* 448 U.S. at 74, 100 S.Ct. at 2543.

Therefore, the only questions that remain are whether the admission of either the redacted Ortiz statement or the Mercado statement constituted harmless error under the *Brecht/Kotteakos* standard. We conclude that the admission of these statements into evidence constituted harmless error because they did not effect actual prejudice resulting in "substantial and injurious effect· or influence in determining the jury's verdict." *Kotteakos,* 328 U.S. at 776, 66 S.Ct. at 1253.

■ As we explained above, the redacted Ortiz statement repeats. the eyewitness accounts of those who actually testified at trial: A friend of Frank and Jimmy who had been beaten by McKinley and Barrett sought revenge. Frank and Jimmy asked Ortiz to drive the friend to Buena Vista Park to pick up two more people and then on to 55 School Street, where Ortiz parked the car. Ortiz maintained that he remained in the car while the others entered the apartment building. Shortly thereafter, he heard shots and two people ran back to his car. One stated that he had stabbed one of them. The other, "Lucan," showed Ortiz a gun. Other than

Ortiz's self-serving statement that he remained in the car while the others took revenge, this statement does not reveal anything different from the above composite of eyewitness accounts of events. Similarly, the Mercado statement, "he was there, we had a fight and that he got hit on the head with a bottle, and that someone got stabbed," repeats the uncontroverted evidence that McKinley was stabbed.

■ Even without this testimony, the evidence against Ayala was overwhelming. Eyewitness accounts placed Ayala in a physically dangerous fight with McKinley and Barrett earlier in the evening. Transcript at 52, 118–22, 217–22. Eyewitness testimony revealed that McKinley threatened grievous bodily harm to Ayala when he whipped out an instrument identified as a "knife" or an "ice pick." Transcript at 122, 222. Eyewitness accounts revealed that Ayala retreated, and then plotted his revenge attack on McKinley and Barrett. *See* Transcript at 122–23, 222. Finally, eyewitness testimony of a non-defendant revealed that Ayala punched McKinley, in a stabbing motion, in the exact bodily location where McKinley suffered from his fatal stab wounds. *See* Transcript at 104–06. In light of the overwhelming evidence of guilt, we find that admission of the redacted Ortiz statement and the Mercado statement did not result in actual prejudice to Ayala under the *Brecht/Kotteakos* standard.

In short, the fact that the jury heard Everett's pre-trial *Wade* testimony, which roughly paralleled Bunch's live testimony, heard Ortiz's written statement, which other live testimony corroborated except to the extent that it was self-serving, and Mercado's oral statement, which was corroborated by the physical evidence and testimony of the doctors, did not have a substantial and injurious effect or influence in determining the jury's verdict.

### VII.

### *Conclusion*

We conclude that Ayala is not entitled to habeas relief because although the admission of the redacted Ortiz statement and the Mer-

cado statement was in violation of federal constitutional law, the admission constituted harmless error under the new *Brecht/Kotteakos* analysis of the Supreme Court. Further, while the admission of Everett's pre-trial *Wade* testimony was in violation of New York state evidentiary law, the error did not rise to the level of a federal constitutional violation.

Judgment affirmed.