**UNITED STATES of America,**
**Appellee,**

v.

**Uval TUBOL, aka Alon Yasar,**
**Defendant–Appellant.**

**Docket No. 98–1519**

United States Court of Appeals,
Second Circuit.

Argued: April 26, 1999

Decided: Aug. 19, 1999

Christopher J. Gunther, Assistant U.S. Attorney, Brooklyn, NY (Zachary W. Carter, U.S. Attorney, Eastern District of New York; Peter A. Norling, on the brief), for Appellee.

Richard J. Shanley, Brooklyn, NY, for Defendant–Appellant.

Before: WINTER, Chief Judge, and MINER and POOLER, Circuit Judges.

POOLER, Circuit Judge.

Defendant Uval Tubol appeals his convictions for violating the Hobbs Act, 18 U.S.C. § 1951, by robbing an appliance store; possession of a firearm; and bank robbery. A jury in the United States District Court for the Eastern District of New York convicted Tubol of (1) robbing the appliance store, (2) using a firearm in connection with the appliance store robbery, (3) robbing a bank, and (4) being an illegal alien in possession of a firearm. Tubol concedes his guilt on the last charge but argues that the jury lacked sufficient evidence to convict on both of the robbery counts and on the gun count associated with the appliance store robbery. Tubol also contends that the district court erred by joining the appliance store robbery, bank robbery, and illegal alien in possession of a firearm charges for trial. Finally, he argues that the court erred by allowing the government to introduce evidence that Tubol (1) admitted participation in an unrelated Israeli bombing and (2) congratulated police officers upon his arrest. We find that the jury had sufficient evidence to sustain Tubol's conviction on all counts but agree with Tubol that the robbery counts were insufficiently similar to justify joinder and that the district court should not have allowed testimony concerning Tubol's participation in an unrelated bombing. Because these errors were not harmless, we vacate Tubol's conviction on the challenged counts and remand for new trials.

## BACKGROUND

In an indictment returned June 3, 1997, a grand jury sitting in the Eastern District of New York charged that on March 31, 1995, Tubol robbed the First Bank of the Americas located in Flushing, New York, and thereby violated 18 U.S.C. § 2113(a)(2). On September 18, 1997, the grand jury returned a superseding indictment that additionally charged Tubol with violating the Hobbs Act by robbing Kitchen Rejuvenation, an appliance store also located in Flushing, on March 15, 1995. A second superseding indictment issued October 9, 1997, charged Tubol with committing the bank robbery and the appliance store robbery and using a gun in the appliance store robbery in violation of 18 U.S.C. § 924(c)(1). On December 19, 1997, the grand jury issued a third superseding indictment. This indictment additionally charged that on April 28, 1995, Tubol, an illegal alien, knowingly and intentionally possessed a Baretta 9 mm. semi-automatic pistol and ammunition in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2).

After Tubol received copies of witness statements from the government, he argued that the bank robbery charge should be tried separately from both of the appliance store robbery charges and the illegal alien gun possession charge.[1] Tubol offered two reasons for severance: (1) his chosen attorney would have to testify during trial of the appliance store robbery

---

1. Tubol initially requested only that the court sever the April 28, 1995, gun possession charge from the earlier charges. He expand-ed his request during oral argument in the district court.

count[2] and (2) the offenses did not qualify for joinder under Fed. R.Crim. Proc. 8. Tubol argued that joinder was improper because the charged offenses were not sufficiently similar. He pointed out that the witness statements indicated the bank robber dressed as a Hasidic Jew and carried a fake bomb while the appliance store robber did not wear Hasidic dress, did not carry a bomb, fake or otherwise, and did carry a gun. After some hesitation, the district court granted Tubol's severance motion and determined to try the bank robbery charge first.

The court also addressed several evidentiary issues before trial began. Over Tubol's objections, the court determined that the government could offer evidence that Tubol congratulated the officers who caught him and said that six different police agencies were looking for him. The court also allowed the government to offer Tubol's admission that—for a fee of $25,000—he planted a bomb in a house in Israel a month before the bank robbery. The court, however, declined to allow the government to prove Tubol's possession of a gun at the time of his arrest because no witness claimed Tubol used a gun in the bank robbery.

Tubol's first trial ended in a mistrial after the jury informed the court that it was unable to reach a verdict.

Before Tubol's scheduled second trial on the bank robbery charges, the government again asked to offer evidence of Tubol's possession of a gun when he was arrested and of his use of a gun in the appliance store robbery. In support of this request, the government asserted that an additional witness would testify that Tubol had a black handgun in his waistband during the bank robbery. The district court indicated that it would allow the government to prove that Tubol also had a black handgun in his waistband at the time of his arrest. Tubol's attorney, whose conflict had been resolved, then offered to withdraw his objection to joinder of all counts provided that the government did not offer evidence of the Israeli bombing admission or Tubol's additional admission that he dumped guns in a river. The court ordered a joint trial on all counts but allowed the government to offer evidence concerning the Israeli bombing. The court also indicated that it would allow a police detective to testify that Tubol congratulated him but not to offer any additional detail about Tubol's statement. Defense counsel then said, "[o]f course, we have the objections we initially made. We're willing to work within the parameters of the court's ruling." The court responded, "[y]ou don't have much choice."

At Tubol's second trial, the government offered the disputed evidence along with other evidence of the charged crimes. Jonathan Weiner, the appliance store proprietor, testified concerning the robbery of his store substantially as follows. A man whom Weiner described as "Israeli, an Arab," came into the brightly lit store about five or six o'clock p.m. and spoke with Weiner in Hebrew for about half an hour. The conversation ended abruptly when the Israeli threatened Weiner with a gun. When Weiner tried to push a silent alarm, the robber slapped him. Weiner then gave the robber his wallet, and the robber left the store.

Eight weeks later Weiner selected Tubol's picture from a photo array. However, some time after identifying Tubol from the photo array, Weiner viewed a lineup in which Tubol participated and identified a different individual. Weiner explained that he actually didn't recognize anyone in the lineup and that he had difficulty making an identification because a clear glass partition separated him from the lineup. At trial, Weiner could not recall the robber's build or his face but testified that he could still recognize Tubol as the robber from the photo array as well as a photo of

---

**2.** Tubol's attorney viewed the lineup procedure for the appliance store robbery, and his memory of the lineup differed from that of potential government witnesses.

the lineup. Weiner also testified that a gun taken from Tubol at the time of his arrest resembled the gun that the robber used to threaten Weiner. No other physical evidence linked Tubol to the appliance store robbery.

Three eyewitnesses testified concerning the bank robbery. John Nolasco, the teller that Tubol allegedly robbed, testified that the robber spoke in easily understood English and his voice was not unusual. Nolasco also indicated that the robber had a gun. However, the government stipulated that Nolasco did not mention a gun when law enforcement officers first interviewed him. Nolasco did tell investigating officers that the robber was approximately six foot two and had crooked lower teeth. Tubol is five foot ten and displayed his teeth, which he claims are straight, to the jury. Nolasco did not identify Tubol as the robber at trial but did testify that about a month before trial he looked at a six-person photo array and eliminated all of the pictures except Tubol's and another person's.

However, Nolasco did identify the holdup note, which said:

I got a bomb and a gun, put all the money in the bag and if I see any cops *everybody* dies. After you give me the money get on the floor. You better No cops or else

The note is signed with an idiosyncratic scrawl that closely resembles the signature Tubol used to acknowledge receipt of *Miranda* warnings when he was arrested. However, the government did not offer expert testimony that Tubol wrote the holdup note. The bomb referred to in the note turned out to be a hoax, composed of road flares, wires, and an alarm clock.

Jenny Jaches, the bank's assistant branch manager, testified that she got a quick look at the robber as he entered the bank. The robber said "good morning" to Jaches, and she saw his face. Later Jaches looked up two or three times from her work and observed the robber at the teller window. She noticed that the robber was dressed as a Hasidic Jew and wore a hat with a round brim and glasses but could not recall whether he had any facial hair. Like Nolasco, Jaches said the robber was tall, at least six foot one, and she noticed no accent. In contrast, the three law enforcement officers who interrogated Tubol noted that he did have an accent. After the robbery, Jaches looked at a photo array and picked out Tubol as resembling the man who robbed the bank. At trial, Jaches testified that she could not say with any degree of certainty that the man she selected from the photo array robbed the bank.

Kleber Yepez, another bank employee, identified Tubol as the robber at trial. Yepez saw the robber for only a few seconds in the bank but testified that he had seen the robber earlier at a Spanish cafeteria where he had a longer opportunity to observe him. Yepez did not inform investigating officers of this prior encounter and testified that he later recalled it in a flashback.

Yepez also viewed a photo array and, like Jaches, said that Tubol resembled the bank robber. Prior to seeing the array, Yepez told investigators there was "no way that he would remember or be able to recognize the Hasidic man."

In addition to introducing the holdup note, the government introduced surveillance photos taken at the time of the robbery. Although the government concedes that the photos did not clearly show the robber's face, it argues that the jury could have found that Tubol's height and build and the shape of his face resembled characteristics of the robber shown in the film. No scientific evidence linked Tubol to the bank robbery.

After the government rested, Tubol moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The court denied this motion. The defense called no witnesses, and after summations and charge, the court submitted the matter to the jury. On the second day of delibera-

tion, the jury sent a note to the court indicating it could not come to an agreement on the bank robbery, appliance store robbery, and March 15 gun possession charges. Over defense objection, the court gave the jury an *Allen* charge.[3] The jury then returned a verdict of guilty on all four counts.

## DISCUSSION

### I. Joinder

Fed. R. Crim P. 8(a) provides that:

Two or more offenses may be charged in the same indictment or information ... if the offenses charged ... are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

The court may also order that two or more indictments be tried together if the counts they contain could have been joined in a single indictment. *See* Fed.R.Crim.P. 13. Even where the government properly joins offenses, the court may order severance "[i]f it appears that a defendant or the government is prejudiced." Fed. R.Crim.P. 14. Here, the district court severed the bank robbery count from the appliance robbery and gun counts prior to the first trial but then decided to rejoin them prior to the second trial.

■ We review the propriety of joinder de novo as a question of law. *See United States v. Uccio,* 917 F.2d 80, 87 (2d Cir. 1990); *United States v. Werner,* 620 F.2d 922, 926 (2d Cir.1980). If Rule 8 did not permit joinder, we must reverse Tubol's convictions unless the error was harmless. *See Werner,* 620 F.2d at 926.

■ The government first argues that Tubol waived his objection to joinder by agreeing to a joint trial provided that the court exclude all proof of his admissions concerning the Israeli bombing and an incident in which Tubol allegedly dumped guns in a river. However, Tubol clearly conditioned his agreement to joinder on exclusion of the admissions. The government's understanding of the condition is reflected in the prosecutor's statement that "[h]e seems to say that he wants the statement about the bomb out, as a prelude to doing this." Because the district court allowed proof of Tubol's admission that he placed a bomb in a house in Israel, Tubol did not waive his objection. Although the government argues that Tubol again acquiesced to joinder when his counsel said that he was "willing to work within the parameters of the court's ruling[s]," Tubol, as the district court correctly noted, had no choice but to abide by the court's rulings.

■ The government also argues that joinder was proper because the charged offenses were of the same or similar character and constituted part of a common pattern of conduct. In support of this argument, the government emphasizes that all three offenses were committed in close geographical proximity within a six-week period and all involved the use of a gun. Tubol, of course, focuses on the differences. The bank robber dressed as a Hasidic Jew, spoke in English with no noticeable accent, and although he claimed to have a gun and a bomb in his holdup note, did not brandish a weapon. The bank robber also acted with dispatch. On the other hand, the appliance store robber acted at a leisurely pace, pulled a gun on his victim, and spoke in Hebrew. We have allowed the joinder of separate robbery counts when they occurred in close geographical or temporal proximity and the perpetrator used the same *modus operandi* in each. *See United States v. Di Giovanni,* 544 F.2d 642, 644 (2d Cir.1976) (upholding joinder of bank robberies where they were committed within six days of each other and the *modus operandi* was the same in both); *see also United States v. Chambers,* 964 F.2d 1250, 1250–51 (1st Cir.1992) (upholding joinder of six robber-

---

**3.** *See Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

ies where each "involved a similar institutional victim—a federally insured bank"; all occurred in a limited period of time in a limited area; and each had a similar *modus operandi* "with the robber always wearing a hat or cap, always threatening violence with a bomb or gun, and always giving the teller a handwritten note demanding money in basically the same language"). Tubol allegedly used distinctly different methods in the two robberies for which he was convicted. Moreover, he targeted distinctly different victims—a bank and a small store. In the face of these differences, the use of a gun and proximity in time and place do not sufficiently support joinder.

However, the court did not err by joining Count Four, the gun possession charge related to Tubol's alien status, with either of the robbery charges. Joinder is proper where the same evidence will support both of the joined counts. *See United States v. Blakney*, 941 F.2d 114, 116 (2d Cir.1991). Because eyewitnesses testified that the perpetrator of both robberies carried a gun, the government was entitled to offer evidence that Tubol had a gun when arrested to show that he had the means to commit the robberies. *See United States v. Robinson*, 560 F.2d 507, 509, 513 (2d Cir.1977) (en banc). Therefore, the gun count could properly have been joined to either of the robbery counts.

## II. The Israeli Bombing Incident

Fed. R. Evid. 404(b) provides that: Evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...

Pursuant to this rule, the district court allowed a government witness to testify that Tubol admitted that (1) he planted a bomb in an Israeli residence a few weeks before the charged robberies, (2) the bomb caused no injuries, and (3) he received $25,000 for his actions. The court reasoned that the prior incident was admissible to show identity because the defendant used a similar *modus operandi* in both instances, that is, the use of a bomb or a threat of a bomb to extort money. The court also found that the statement tended to prove that Tubol knew how to rig a bomb. In its charge, the district court instructed the jury that Tubol's admission could be considered only on the issue of identity.

We review a district court's admission of similar acts evidence for abuse of discretion. *See United States v. Morrison*, 153 F.3d 34, 57 (2d Cir.1998). The evidence is admissible if it "is relevant to an issue at trial other than the defendant's character, and if the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice." *Id.* We have allowed proof of prior bad acts to show identity where the defendant used very similar methods in the charged crime and the prior bad act. *See, e.g., United States v. Mills*, 895 F.2d 897, 907–08 (2d Cir.1990) (indicating that district court permissibly could have allowed proof that process used to make counterfeit bills "was a unique one, that ... had been encountered only once before in the experience of the Secret Service, and that on that prior occasion the perpetrator was [the defendant]"); *United States v. Sliker*, 751 F.2d 477, 486–87 (2d Cir.1984) (allowing proof of similar fraud where "[b]oth schemes depended upon the use of phony bank checks issued by the same non-existent offshore bank as well as on prearrangement with an 'officer' of the bank to confirm the validity of the checks" despite the fact that victim of one scheme was a bank and victim of the other was a diamond seller); *United States v. Danzey*, 594 F.2d 905, 911 (2d Cir.1979) (allowing proof of prior robberies where appellant conceded he had a trademark method of robbing a bank and methodologies were very similar). If Tubol's

admission is credited, someone paid him to plant a bomb in a residence in Israel. In the bank robbery, he gave the bank teller a note claiming to have a bomb but actually had a hoax bomb. There is no proof that the hoax bomb and the Israeli bomb shared any characteristics beyond the word "bomb" or that Tubol used them in similar ways. Because the Israeli bombing and the charged crimes in this case were not similar in the manner contemplated by *Mills, Sliker,* and *Danzey,* the relevance of Tubol's admission was slight at best.

The government argues, in the alternative, that Tubol's knowledge of how to build a real bomb supports the conclusion that he knew how to build a hoax bomb. However, it seems unlikely that constructing a fake bomb of road flares, wires, and an alarm clock requires any unusual degree of technical knowledge. Therefore, relevance is remote on this theory as well. Whatever limited relevance Tubol's admission had was substantially outweighed by the extraordinary prejudice of testimony indicating that Tubol planted a bomb. This testimony goes directly and principally to character, the very evil that Rule 404 attempts to prevent. The jury fairly could have understood the detective's testimony to mean that Tubol planted a real bomb in a residence, and, in this decade, Americans have cause to consider bombers to be particularly evil people.

## III.  The Congratulatory Remark

■  Tubol also alleges that the district court erred by allowing a government witness to testify that Tubol said "congratulations" when he was arrested. The district court admitted this evidence as consciousness of guilt. Tubol contends that the court erred because (1) there was an insufficient nexus to the crimes with which he was charged to constitute evidence of consciousness of guilt; (2) the testimony was unreliable because the witness failed to memorialize Tubol's alleged remark in his official records and changed his account over time; and (3) the district court improperly cropped the remark.

Tubol's statement to Sergeant Bill Nevins was first reported in a New York City newspaper as follows: "He congratulated us on catching him ... [h]e said six police agencies were looking for him and only we've been successful." At Tubol's first trial, Nevins testified that Tubol "[c]ongratulated [him] as the best detective in the world because six countries are looking for [Tubol]." To minimize any prejudice to Tubol, the district court ruled before the second trial that Nevins could testify only that Tubol congratulated him. Nevins followed the court's instructions.

■  We perceive no abuse of discretion. Offering congratulations to an arresting officer is some evidence of consciousness of guilt, and any resulting prejudice to Tubol did not outweigh the relevance of his statement. Nor did the district court err by cropping the remark. Tubol could have elicited the full remark on cross-examination had he wished. Finally, the witness' failure to record the remark and his offer of various versions did not render the remark inadmissible. Again, Tubol was free to cross-examine Nevins and to argue to the jury that his account should be given little weight.

## IV.  Harmless Error

■  We have concluded that the district court erred by joining the bank robbery count to the two counts (robbery and possession of a weapon) associated with the appliance store robbery and by allowing the government to offer Tubol's admission that he planted a bomb in Israel. Both these errors are subject to harmless error analysis. *See United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (joinder); *United States v. Colombo,* 909 F.2d 711, 713 (2d Cir.1990) (evidentiary error). We must disregard "[a]ny error, defect, irregularity or variance which does not affect substantial rights." Fed.R.Crim.P. 52(a). We "reverse only if the government is unable

to demonstrate that the error was harmless, that is, that the error did not affect the defendant's substantial rights or influence the jury's verdict." *United States v. Salameh,* 152 F.3d 88, 142 (2d Cir.1998), *cert. denied,* — U.S. ——, ——, ——, ——, 119 S.Ct. 885, 1273, 1274, 1345, 142 L.Ed.2d 785 (1999). However, we must consider the combined potential effect of the erroneous joinder and the evidentiary error on the jury. *See Ayala v. Leonardo,* 20 F.3d 83, 92 (2d Cir.1994) (considering together improperly admitted testimony and statements). "The strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict." *Colombo,* 909 F.2d at 714.

We consider the counts of conviction separately for purpose of our harmless error analysis. Tubol conceded his guilt on Count Four, which charged him with being an illegal alien in possession of a weapon. Therefore, any error was clearly harmless on this count.

■ Counts One and Two concern the appliance store robbery. The evidence supporting both counts is limited to the testimony of the store's proprietor and the fact that Tubol had a gun similar in appearance to the one carried by the robber. The proprietor's identification of Tubol was undermined by his inability to make an in-court identification and his selection of a person other than Tubol from the lineup. Joinder allowed the jury to hear that other witnesses had identified Tubol as the perpetrator of an unrelated robbery. That prejudice was compounded by the evidence that Tubol admitted to a bombing in Israel. Given the relative weakness of the evidence linking Tubol to the crime, we believe that the substantial evidence of other crimes could have infected the jury's verdict.

■ Count Three is the bank robbery. The government's proof on this count is stronger. Two witnesses identified Tubol at one time or another, and the signature on the holdup note looks like Tubol's signature on his acknowledgment of receipt of *Miranda* warnings. However, each of the identification witnesses' testimony was impeached, and the government failed to establish through expert testimony that Tubol signed the holdup note. Moreover, a prior jury that heard only the bank robbery count was unable to reach a verdict. Finally, the jury that convicted Tubol first told the court that it was unable to reach a verdict on this count and convicted him only after receiving an *Allen* charge. Based on these circumstances, we are not persuaded that the joinder and evidentiary errors, considered cumulatively, were harmless.

## V. Sufficiency of the Evidence

■ Although we believe the joinder and evidentiary errors may have infected the jury's verdict and therefore order new trials, we disagree with Tubol's contention that because the jury lacked sufficient evidence to convict him on the first three counts of the indictment, we should direct the district court to enter a judgment of acquittal. *See* Fed.R.Crim.P. 29(a). "[A] defendant who challenges the sufficiency of the evidence to support his conviction after a jury verdict bears a heavy burden." *United States v. Maher,* 108 F.3d 1513, 1530 (2d Cir.1997). We must "view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor." *Id.* (internal quotation marks and citation omitted). In addition, the court must view the evidence "not in isolation but in conjunction." *United States v. Mariani,* 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Geaney,* 417 F.2d 1116, 1121 (2d Cir.1969)). After assessing the evidence, the court must reject the defendant's challenge if "*any* rational trier of fact could have found the essential elements of the crime." *Maher,* 108 F.3d at 1530 (internal quotation marks omitted).

 If the jury credited all of the eye witness testimony against Tubol and drew all inferences from the testimony and the other evidence in favor of the government, it properly could have found Tubol guilty beyond a reasonable doubt on each of the contested counts. In light of the heavier burden Tubol faces on a motion for judgment of acquittal, his sufficiency challenge fails despite the fact that joinder and evidentiary errors require new trials.

## CONCLUSION

For the reasons we have discussed, we affirm Tubol's conviction on the fourth count of the indictment. However, we reverse his conviction on the first three counts of the indictment and remand to the district court for new trials.